## Commonwealth vs. Jacques Robidoux.

Bristol. September 7, 2007. - December 4, 2007.

Present: Marshall, C.J., Greaney, Cowin, Cordy, & Botsford, JJ.

*Homicide. Practice, Criminal,* Capital case, Assistance of counsel, Competency
to stand trial, Defendant's competency, Argument by prosecutor. *Evidence,*
Relevancy and materiality, Insanity, Prior misconduct. *Insanity. Mental
Impairment.*

At a murder trial, the defendant's counsel was not ineffective in failing to raise
the issue of the defendant's competency before trial and in failing to seek an
order forcing the defendant to be examined by a psychiatrist for competency,
where the evidence in the case did not raise a substantial question of pos-
sible doubt as to the defendant's competency, and where the judge was in a
position to observe him at trial and found him competent to stand trial
[151-155]; further, trial counsel was not ineffective in heeding the defendant's
informed refusal to pursue an insanity defense [155-157], and there was no
merit to the claim of ineffective assistance based on failure to present evidence
of the impairment of the defendant's mental processes [157-158]; finally,
trial counsel was not ineffective in failing to object to the admission of
certain evidence [158].

At the trial of an indictment charging the leader of a religious group with
murder in the first degree in connection with the death of his infant son
from starvation, the judge did not err in admitting evidence of the group's
failed trip to Maine some months prior to the death of the defendant's son,
where the evidence was introduced to show that the defendant's decision
not to feed his son in the days before his death (i.e., the defendant's refusal
to deviate from a purported message from God to alter his son's diet) was
markedly different from his decision to cut short the trip to Maine (where
the defendant acknowledged that he had mistakenly interpreted a purported
message from God), and where evidence of the trip was used to paint a
picture of the events preceding the son's death. [158-159]

At a murder trial, the admission in evidence of a police officer's testimony
regarding the defendant's refusal to talk about his wife and deceased child
during an interrogation did not infringe on the defendant's right to remain
silent, where the defendant had not exercised his right to remain silent, and
where his unwillingness to answer a specific type of question did not
manifest an expressed unwillingness to continue with the interview.
[159-161]

The prosecutor's misstatement, in his closing argument at a murder trial, of
the law of third prong malice did not create a substantial likelihood of a
miscarriage of justice, where the judge's instructions cured the misstate-
ment, and where it was highly unlikely that the absence of the improper
statement would have made a difference. [161-163]

This court declined to exercise its plenary power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or to grant a new trial on the ground that the defendant lacked criminal responsibility, where there was no evidence that the defendant had a prior mental illness, and where the record was replete with evidence that the defendant both understood the wrongfulness of his conduct and had the ability to conform his conduct to the requirements of the law. [163-164]

INDICTMENT found and returned in the Superior Court Department on November 13, 2000.

The case was tried before *Elizabeth B. Donovan*, J., and motions for a new trial, filed on June 17, 2002, and October 11, 2005, respectively, were heard by her.

*Janet H. Pumphrey* for the defendant.

*Sharon L. Sullivan-Puccini*, Special Assistant District Attorney, for the Commonwealth.

CORDY, J. Following a purported revelation from God in early March, 1999, the defendant, Jacques Robidoux, and his wife, Karen, restricted their ten month old son's diet to breast milk and water, and deprived him of solid food. Samuel Robidoux died in late April, 1999, within days of his first birthday, from malnutrition caused by starvation. On June 14, 2002, after a nine-day trial, a jury found Robidoux guilty of murder in the first degree by reason of extreme atrocity or cruelty.

On appeal from his conviction and from the denial of his motions for a new trial, Robidoux claims that (1) he was denied effective assistance of counsel based on several transgressions of trial counsel, including his failure to challenge Robidoux's competency before trial, and his failure to present either an insanity defense or evidence of diminished capacity at trial; (2) a substantial likelihood of a miscarriage of justice was created when evidence was admitted improperly (and not objected to by trial counsel) that Robidoux had deprived children of food for three days on a trip to Maine prior to Samuel's death and that he refused to answer certain police questions about his family; and (3) he was deprived of his right to a fair trial because the prosecutor misstated the law of third prong malice in his closing argument. Robidoux also seeks relief under G. L. c. 278, § 33E, contending that he lacked criminal responsibility for murder in the first

degree, and that he was compelled by his religious beliefs to deprive his son of nutrition. We affirm.

1. *Pretrial events*. After a jury were empanelled to hear the case, Robidoux moved to dismiss his trial counsel and to proceed pro se. In doing so, he expressed concern over trial counsel's ability to portray him in accordance with his wishes, and indicated a desire to file certain motions that counsel apparently would not. The judge engaged Robidoux in an extended colloquy regarding both the reasons that he felt his attorney would not be able to portray him as he wished to be portrayed, and his understanding of the trial process and the challenges he would face if he represented himself. Ultimately, Robidoux agreed that, although he had represented himself once in the past, he would not be able to match the cross-examination skills of his attorney, especially with the expert witnesses that the Commonwealth would be calling. Robidoux also agreed that, although he had been involved in the preparation of the case with his counsel, he would need time for "mulling over a lot of the information" to prepare himself fully for trial. Finally, Robidoux agreed that if he felt his attorney would portray him as he wished to be portrayed, he would want him to remain as his counsel.

At the conclusion of the colloquy, the judge granted the request of Robidoux's attorney that the case be continued to the next day (without the empanelled jurors being sworn) so that he and Robidoux could confer further on the subject of how he wanted to be portrayed. Later that day Robidoux filed a "pro se" handwritten "motion to change plea," challenging the jurisdiction of the court to hear the case and the district attorney's office to try the case. The next morning Robidoux orally withdrew this motion, and told the judge that he had had an opportunity to speak with his counsel about his desired course of defense and was content with his counsel's continued representation. His motion to proceed pro se was then denied on several grounds, including its untimeliness and its being filed for the ulterior motive of delay.

2. *Facts*. Based on the evidence at trial, the jury were warranted in finding the following facts. Robidoux's parents, Roland and Georgette Robidoux, have four other children. When the children were young, the family belonged to the Worldwide

Church of God, but they left when Roland and Georgette became disenchanted with its organization. A few years later, Roland began a family Bible study group. A neighboring family, the Daneaus, headed by Roger and Vivian Daneau, joined Roland's Bible study group. Roger and Vivian had several children, including Karen, who became active members of the Bible study group. Several group members intermarried in ceremonies performed by Roland, including Karen and Robidoux.

In the early years, the Bible study meetings were relaxed discussions about a variety of subjects. Over time, however, the group became more structured. The group members began to consider Roland an "elder," a role akin to that of pastor or leader. The meetings began with singing, and then Roland would give a sermon or a teaching. Members of the group began to receive "leadings," or inspirations from God to live life in a certain manner. At first, the recipient of a leading would simply share it with the other group members. As time went on, though, the group began to regard leadings as orders from God to be followed as if they came directly from the Apostle Paul. If a member questioned a leading, that member questioned God, and Roland tried to convince that member otherwise. If the member then did not correct sinful behavior, the group "disfellowshipped" the person and stopped any association with that member.

The course of the group changed substantially after Roland became enthralled with the works of author Carol Balizet. He began to instruct the group to pull out of what Balizet regarded as "Satan's seven counterfeit systems," including medicine, education, science, arts and entertainment, the legal system, banking, and mainstream religion. Group members were instructed to withdraw from the medical world. Many group members stopped using banks and relied exclusively on cash. As the group became more isolated from the modern world, its members also became more insular; they all began living together and conversing with only fellow members.

At some point during this transition, Robidoux was ordained as an elder by his father. Now led by two elders who were thought to be working closely with God, the group was rapidly withdrawing from society. In June, 1998, the group held an

impromptu meeting and discussed how God was taking them someplace else to live. Robidoux claimed that he had received a leading that God wanted them to leave that night for a journey into the wilderness. All of the group members were instructed to leave behind all food and diapers and assets with which they could be bought, including money and jewelry. The full group, including roughly twenty adults and twenty children, then embarked on their journey in six or seven automobiles. Before doing so, they decided not to fill the gasoline tanks of the vehicles because, as with the lack of provisions, God was expected to provide. Robidoux led the way.

The journey was markedly unsuccessful. The group left late on a Wednesday night, and returned on the following Saturday afternoon. Along the way, several vehicles ran out of gasoline. The members slept in their vehicles and used torn up sweatshirts and shoelaces for diapers. The children complained of hunger, and some of them vomited. Roland promised that a feast would be forthcoming, and when no food appeared, group members thought about abandoning the trip. On the third day, Robidoux decided that the trip was not "of God," and that he had been deceived by the leading. He admitted that the trip was a mistake. Later, though, he characterized the trip as a lesson in failure, and a "dry run" for "something bigger that was going to happen."

Samuel was about six or seven weeks old at the time of the group's trip. He had been born, without complication, on April 29, 1998. He was alternatively described by family members as "active" and "robust." At the age of eight months, in January, 1999, Samuel "ate willingly anything that was put in front of him." He was able to sit and had started to walk by grabbing on to furniture.

Then in early March, 1999, one of Robidoux's sisters informed him that she had received a leading. The leading purportedly indicated that Karen was excessively prideful, foolish, and vain. Karen was pregnant at the time, and the group believed that she was bearing twins; according to the leading, God was taking one of those twins away. The leading also contained strict dietary requirements for Karen and Samuel. Karen was instructed to

drink one gallon of almond milk each day. She was also instructed to nurse Samuel for ten minutes on each breast every hour, and to eliminate solid food from his diet.

Four days after the leading, Karen began following the instructions. Samuel was never again fed solid food. Even after the first day of the diet change, Samuel was crying and Robidoux began to question the exact contents of the leading. He began to supplement Karen's breast milk with almond milk, but after only four days Roland instructed him that anything besides breast feeding was contrary to God's will. Meanwhile, Karen's milk supply was diminishing, in part due to her pregnancy and the stress of the situation.

In the following days and weeks, Samuel's restrictive diet began to take a substantial toll on the child. Once healthy and active, he became meek and lethargic; he no longer crawled or even sat up. His bones became visible, his face got thin, his dimple disappeared, and "his eyes appeared sunken." Karen was so distressed by Samuel's appearance that she could no longer bathe him.

As March turned to April, Samuel continued to deteriorate. The skin on his chest changed to a dark color, and at times his eyes would roll up in the back of his head. His cry became hoarse, he ground his teeth, and he could no longer hold himself up.

Robidoux did not take Samuel to a hospital or relax his dietary restrictions. Instead, he called a special meeting of the group in late April to pray for Samuel, in the hope of reversing his dire condition. Early the next morning, Robidoux informed the group that Samuel was dead.

Robidoux placed Samuel's remains in a homemade casket and stored the casket in the bulkhead of a home belonging to one of his sisters for several months. On October 11, 1999, Robidoux, David Corneau, and Timothy and Mark Daneau (Karen's brothers) went hiking in remote Baxter State Park in Maine, carrying a plywood casket that contained the remains of Samuel.[1] After hiking for about seven hours, the group left the trail where

---

[1]The group also carried a second casket containing the remains of Jeremiah Corneau, the stillborn son of David Corneau and Rebecca Robidoux, another of Robidoux's sisters.

they "felt comfortable." There, 300 or 400 feet off the trail, they buried the caskets.[2]

At trial, the Commonwealth's experts included Maine's chief medical examiner, a forensic anthropologist, and a pediatrician with a background in treating malnourished children. The medical examiner testified that after examining Samuel's remains she determined that the cause of his death was severe malnutrition due to starvation. The forensic anthropologist noted significant abnormalities in Samuel's bones, consistent with a pattern of malnutrition. The pediatrician described Samuel's deterioration as consistent with malnourishment.

Robidoux called a pediatric forensic pathologist, who testified that after reviewing the autopsy materials, he was unable to establish a cause of death for Samuel. He further opined that Samuel may have died from any number of diseases, including scurvy that may have set in before his diet was restricted. Robidoux also testified in his defense, admitting to noticing drastic changes in his son after the dietary restrictions began; conceding that Samuel's deteriorating health was "based on his not getting enough nourishment"; and telling the jury that the events from early March through April, 1999, were a "product of mistakes and misunderstandings." Regarding his responsibility for depriving Samuel of sufficient nourishment, Robidoux testified that "[t]he buck stops here."

3. *Motions for a new trial.* After the jury returned a verdict of guilty of murder in the first degree, trial counsel filed a motion for a required finding of not guilty or for a new trial; it was denied.[3] With the assistance of new counsel, Robidoux filed

[2]Despite an extensive police search of the area, including canine searches and helicopter flyovers using infrared sensors, Samuel's remains were not found until David Corneau led investigators to the grave site one year later.

[3]In his first motion for a new trial, Robidoux asserted the following grounds of prejudicial error: the judge's response to a jury question regarding reasonable doubt lessened the Commonwealth's burden; the judge failed properly to charge on third prong malice; the charge on cause of death was ambiguous; the prosecutor exceeded the bounds of proper final argument; the verdict was against the weight of the evidence; and Robidoux was impermissibly deprived of a public trial. The motion was denied, and its claims are not pressed on appeal. Based on our review of the entire record of the case pursuant to G. L. c. 278, § 33E, we perceive no substantial likelihood of a miscarriage of justice with respect to these issues.

a second motion for a new trial on October 11, 2005. The claims raised in that motion are virtually identical to the claims raised in the present appeal. The motion was supported by three affidavits.

In his affidavit, Robidoux stated that his trial counsel "discussed with [him] the various ways to try [his] case, including the insanity defense," but that, "[p]rior to [his] trial, there was simply no way that [Robidoux] would talk to a doctor or a psychotherapist." Robidoux also stated that his attorney told him that he had an absolute right to testify in his own defense, and that he exercised that right because he "felt that it was important to tell the jury [his] side of the story," and he "wanted to tell the jury that [he] had misinterpreted the message from God, that [he] was responsible for Samuel's death, and that [he] was extremely remorseful about it."

The other two affidavits were from Ronald S. Ebert, a psychologist, and Reverend Robert Pardon, the director of the New England Institute of Religious Research. Dr. Ebert averred that, although he had never interviewed Robidoux, it was his opinion that Robidoux was unable to appreciate or understand that it was wrong to deprive his son of solid food. Reverend Pardon opined that Roland exercised undue influence over Robidoux at the time of trial, making it virtually impossible for his trial lawyer to present an adequate defense. Reverend Pardon's opinion was based, in part, on four interviews he conducted with Robidoux, before and after trial.

The motion was denied by the trial judge without an evidentiary hearing. In her memorandum of decision, the judge found that there was no evidence that Robidoux was incompetent to stand trial, and her observations during the course of trial were not to the contrary. She further found that, as a competent defendant, Robidoux knowingly chose to reject both an insanity defense and a diminished capacity strategy, as was his right.

4. *Ineffective assistance of counsel claims.* Robidoux argues that trial counsel was ineffective and failed to present an adequate defense on his behalf. Specifically, he asserts that counsel failed to raise the issue of his competency prior to trial; failed to pursue the most plausible defense, insanity; and failed to present evidence of diminished capacity at trial. He further contends

that trial counsel inexcusably failed to object to prior bad act testimony and the introduction of Robidoux's postarrest silence.

"In evaluating a defendant's claim of ineffective assistance of counsel in a capital case, we consider whether there was error at trial and, if so, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003). See *Commonwealth* v. *Candelario*, 446 Mass. 847, 854 (2006); *Commonwealth* v. *Wright*, 411 Mass. 678, 682 n.1 (1992). We also give trial counsel's tactical decisions due deference, unless those decisions are manifestly unreasonable when made. See *Commonwealth* v. *Candelario*, *supra*; *Commonwealth* v. *Gaboriault*, *supra*.

a. *Competency.* Appellate counsel argues that Robidoux's trial counsel was ineffective because he failed to raise the issue of competency before trial and failed to seek an order forcing Robidoux to be examined by a psychiatrist for competency. In support of this contention, appellate counsel stresses the oddity of Robidoux's "motion to change plea" filed pro se on the eve of trial. In that motion, Robidoux challenged the jurisdiction of the court and the district attorney's office under "Private Roman Civil Law," and declared independence from the Fourteenth Amendment to the United States Constitution. Appellate counsel also contends that when Robidoux refused to be evaluated by a psychiatrist for the preparation of a potential insanity defense, trial counsel should have immediately requested a competency hearing.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Commonwealth* v. *Crowley*, 393 Mass. 393, 398 (1984), quoting *Drope* v. *Missouri*, 420 U.S. 162, 171 (1975). To do otherwise would violate a defendant's due process rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Companonio*, 445 Mass. 39, 48 (2005); *Commonwealth* v. *Hill*, 375 Mass. 50, 51-52 (1978). A defendant's competency, however, is not measured by the presence or absence of any particular psychiatric diagnosis. *Commonwealth* v.

*Goodreau*, 442 Mass. 341, 350 (2004). Instead, the inquiry is whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Commonwealth* v. *Crowley*, *supra* at 388, quoting *Dusky* v. *United States*, 362 U.S. 402, 402 (1960).

When a defendant alleges, as here, that counsel failed to request a competency hearing or that the judge failed to hold one on her own initiative, we ask, "whether, no less on hindsight than by foresight, there were elements of such indication in the situation as, if proper notice had been taken of them, could present a substantial question of possible doubt as to [a defendant's] competency to stand trial." *Commonwealth* v. *Hill*, *supra* at 54, quoting *Rhay* v. *White*, 385 F.2d 883, 886 (9th Cir. 1967).

The evidence in this case does not raise a "substantial question of possible doubt" on the issue of competency. Robidoux discussed a potential insanity defense with trial counsel, but elected not to pursue it. Regardless whether that defense was plausible, or the most plausible option, refusal to pursue it does not alone raise a "substantial question of possible doubt" as to competency. See *Commonwealth* v. *Companonio*, *supra* at 50. Just as a defendant is not obligated to pursue an insanity defense, he is not obligated to seek a psychiatric evaluation to support that defense. If we are to protect a defendant's autonomy to make decisions relating to his defense, see *Commonwealth* v. *Federici*, 427 Mass. 740, 744-745 (1998), the exercise of that autonomy cannot alone be grounds to doubt his competency.

Robidoux's decision to file both a motion to proceed pro se and an admittedly odd motion "to change plea" just before the start of trial are, without more, also insufficient to create a "substantial question of possible doubt" as to his competency to stand trial. This is particularly the case where the judge had occasion to examine Robidoux directly about the motivation for those motions at the time they were filed, and was satisfied that they were filed principally for the ulterior purpose of delay.

This case is significantly different from *Commonwealth* v. *Hill*, *supra*. In that case we were persuaded that the trial judge

erred by failing to recognize a substantial question about the defendant's competency during the course of the trial, and by failing (sua sponte) to hold an evidentiary hearing and make findings on that subject. The facts known to the judge about the defendant that led us to our conclusion included a decades-long history of psychological problems (chronic schizophrenia with delusional behavior), multiple mental hospitalizations (extending back thirty-six years) at Bridgewater State Hospital and elsewhere, expert testimony (offered as part of the defense case on insanity) that those mental problems continued to exist up to the present, and testimony (at trial) from the court-appointed psychiatrist that he doubted "whether the defendant was competent to stand trial." *Id.* at 57.[4] See *Commonwealth* v. *Companonio, supra* at 50 & n.9 (distinguishing case from *Commonwealth* v. *Hill, supra*).

There are no similar circumstances in this case. Robidoux has no history of mental illness, mental impairment, or hospitalization. All Robidoux presents on the issue of competency is his decision to forgo an insanity defense because it was contrary to how he wished to be portrayed, his decision to forgo a psychiatric examination because it was against his religious beliefs, and the filing of pro se motions that the judge concluded were submitted for the ulterior purpose of delay.

Most important, in denying Robidoux's second motion for a new trial, the judge, who was in a position to observe him throughout the trial, found that Robidoux was competent to stand trial. Her finding is amply supported by the record. Right after empanelment Robidoux moved to proceed pro se, because he was concerned that his counsel would not portray him in the light he wished. The judge conducted a lengthy colloquy, asking Robidoux about his differences with trial counsel, and about the nature of the proceedings against him. Robidoux's answers were lucid and clear, indicating an understanding of the proceedings and the rules of evidence. Robidoux's motion to change

---

[4]The court in *Commonwealth* v. *Hill*, 375 Mass. 50, 58 (1978), noted that this evidence was so substantial at trial that the judge should have held a competency hearing even though there had been a competency examination (fifteen months prior to the trial) that found the defendant competent in spite of his mental illness, and even though the defendant's conduct at trial was apparently not unusual.

plea that followed was not entirely coherent, but he withdrew the motion the next day. Robidoux later chose to testify (after discussing it several times with trial counsel), deciding to tell his "side of the story," and to express remorse for his "responsib[il-ity] for Samuel's death." In his testimony, Robidoux accomplished his objective. And, in telling his story, the judge found that Robi-doux was "clear, concise and intelligent." Moreover, as the judge found, the record contains no reason to doubt Robidoux's ability to consult rationally with defense counsel and to understand the nature of the proceedings against him. See *Commonwealth* v. *Crowley*, 393 Mass. 393, 398 (1984). Instead, it reflects substantial consultation with trial counsel, with Robidoux playing a central role in determining how he would be portrayed. On this basis, the judge found that Robidoux had been competent to stand trial. This determination is entitled to substantial deference because the judge had the opportunity personally to evaluate Robidoux. *Commonwealth* v. *Brown*, 449 Mass. 747, 759 (2007).

"Because the judge's finding of competency was supported by the evidence [considered in connection with a motion for a new trial], a substantial likelihood of a miscarriage of justice does not exist concerning when and how the competency issue was raised; the ultimate outcome would have been the same." *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 469-470 (1998) (denying claim that counsel was ineffective for not asserting incompetency at time of trial). See *Commonwealth* v. *Serino*, 436 Mass. 408, 416 (2002), quoting *Commonwealth* v. *Satter-field*, 373 Mass. 109, 115 (1977) (holding that in light of evidence supporting trial judge's ruling that defendant was competent to stand trial, "it cannot be fairly stated that 'better work [by counsel] might have accomplished something material for the defense' on this issue"). Robidoux's claim of ineffective as-sistance of counsel on the matter of competency to stand trial fails for the same reason.

b. *Insanity defense.* Before trial, Robidoux expressed significant concern about how he would be portrayed by trial counsel. Robi-doux feared that the jury and the media would get the impression that the Robidoux religious group was a cult. He discussed pursu-ing an insanity defense with his trial counsel, but ultimately rejected that course of action. Robidoux likewise refused to talk

with a doctor or psychotherapist in connection with the preparation of such a defense.

We have stressed the importance of protecting a defendant's autonomy to make decisions relating to his defense. See *Commonwealth* v. *Federici*, 427 Mass. 740, 744 (1998); *Commonwealth* v. *Martin*, 425 Mass. 718, 721 (1997). Consistent with this protection, for example, we acknowledge a defendant's constitutional right to proceed pro se even if doing so harms his defense because "respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires and if he makes the choice 'with eyes open.' " *Commonwealth* v. *Martin*, *supra*, quoting *Commonwealth* v. *Mott*, 2 Mass. App. Ct. 47, 52 (1974). Similarly, a defendant may refuse to "label himself as 'criminally insane,' " even if that precludes his most effective defense, as long as he is competent and does so with knowledge of the consequences. *Commonwealth* v. *Federici*, *supra* at 744-745. If those two requirements are met, the decision whether to pursue a defense of lack of criminal responsibility ultimately lies with a defendant. See *Commonwealth* v. *Murphy*, 442 Mass. 485, 502-503 (2004).

Here, Robidoux exercised his autonomy knowingly and competently. Like the defendant in the *Federici* case, he discussed the prospects for an insanity defense with trial counsel. See *Commonwealth* v. *Federici*, *supra* at 744-745. He chose not to pursue this option, and instead desired to tell the jury that he had "misinterpreted [a] message from God, that [he] was responsible for Samuel's death, and that [he] was extremely remorseful about it." He evidenced an understanding that he could not present a defense of lack of criminal responsibility if he felt it were important to take responsibility for the crime. Robidoux does not allege that trial counsel failed to provide him with sufficient information regarding his choices at trial and their consequences. Nor does Robidoux contend that he refused an insanity defense on the basis of insufficient information. Instead, he argues that trial counsel should have proceeded with that defense regardless, disregarding his wishes. Such a holding would stand in stark contrast to our prevailing law. See *Commonwealth* v. *Federici*, *supra* at 744-745.[5]

It cannot be considered error for counsel to heed a competent

---

[5]Robidoux was not advised of the consequences of rejecting an insanity

defendant's informed refusal to pursue an insanity defense. See *Commonwealth* v. *Federici, supra*; *Commonwealth* v. *Murphy, supra* at 502-503. Accordingly, we do not second guess this decision, and we find no substantial likelihood of a miscarriage of justice.

c. *Evidence of diminished capacity.* While Massachusetts does not have a defense of "diminished capacity," *Commonwealth* v. *Hardy*, 426 Mass. 725, 729 n.5 (1998), a defendant on trial for murder in the first degree may produce evidence and expert testimony that the impairment of his mental process precluded him from acting with extreme atrocity or cruelty. *Commonwealth* v. *Candelario*, 446 Mass. 847, 856 (2006). See *Commonwealth* v. *Companonio*, 445 Mass. 39, 45 n.7 (2005), quoting *Commonwealth* v. *Gould*, 380 Mass. 672, 673 (1980). Robidoux contends that trial counsel's failure to present such evidence amounts to ineffective assistance of counsel. This contention is unavailing.

First, trial counsel did present substantial evidence of Robidoux's particular mental state, as contemplated by *Commonwealth* v. *Gould, supra* at 686. On direct testimony, Robidoux stated that he never expected that Samuel would die. He further testified that, despite Samuel's emaciated condition, he would be well because God would take care of him. Indeed, the jury were presented with evidence that Robidoux believed that if Samuel stopped breathing he would be resurrected by God. In addition, in his opening and summation and during the cross-examination of witnesses, trial counsel conveyed to the jury that Robidoux's beliefs were different from the norm. He likewise stressed the substantial influence that Robidoux's father and sister exerted over his actions.[6]

That trial counsel did not present expert witness testimony on

defense by the judge, as were the defendants in *Commonwealth* v. *Murphy*, 442 Mass. 455, 502-503 (2004), and *Commonwealth* v. *Federici*, 427 Mass. 740, 744-745 (1998). Given the circumstances of this case, Robidoux's choice was not any less informed. As the judge found in deciding the second motion for a new trial, Robidoux "made an intelligent choice."

[6]Trial counsel also requested (unsuccessfully) a jury instruction that would highlight Robidoux's unique state of mind and susceptibility to influence by his religious group. Regarding the objective element of third prong malice instruction, trial counsel asked that the jury be instructed to determine malice based on whether "a reasonable person with what you find as [Robidoux's]

the issue of diminished capacity was precisely because Robidoux "wanted nothing to do" with doctors or psychotherapists. As this court held in *Commonwealth* v. *Companonio, supra* at 51, trial counsel's decision to forgo pursuit of a "diminished capacity" defense was not unreasonable in light of the fact that it was based on Robidoux's personal choice.

d. *Evidentiary issues.* To the extent Robidoux contends his trial counsel was ineffective for failing to object to the admission of certain evidence, his claim fails. As discussed below, the evidence was properly admitted. Consequently, trial counsel's decision not to object to its introduction was not error. See *Commonwealth* v. *DelValle*, 443 Mass. 782, 791 (2005).

5. *Admission of evidence of the first trip to Maine.* Robidoux contends that evidence of the failed trip to Maine on which he led his religious group in June, 1998, was irrelevant prior bad act evidence that should not have been admitted. "It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved . . . for the purposes of showing his bad character or propensity to commit the crime charged . . . ." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Such evidence may be admissible, however, if relevant for some other probative purpose, including to show intent, motive, state of mind, or some other relevant issue at trial. *Commonwealth* v. *DelValle, supra* at 790. Additionally, the "prosecution [is] entitled to present as full a picture as possible of the events surrounding the incident itself," as long as the probative value of the evidence presented is not substantially outweighed by any prejudice to the defendant. *Commonwealth* v. *Marrero*, 427 Mass. 65, 67 (1998), quoting *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269-270 (1982). Determinations of the relevance, probative value, and prejudice of such evidence are left to the sound discretion of the judge, whose decision to admit such evidence will be upheld absent clear error. *Commonwealth* v.

---

state of mind and life experience would have recognized" that his conduct created a plain and strong likelihood that death would result. By contrast, the objective part of the model instruction focuses on what a reasonable person would have recognized, without the qualifiers suggested by trial counsel. Model Jury Instructions on Homicide 12 (1999). That the model instruction was given cannot be considered error on behalf of trial counsel. See *Commonwealth* v. *Whitman*, 430 Mass. 746, 757 (2000).

*DelValle, supra.* See *Commonwealth* v. *Marrero, supra* at 67-68.

Evidence of Robidoux's trip to Maine was not introduced to demonstrate that, because he had deprived children of food in the past, he was more likely to have starved the victim as well, or that he was a person of bad "character." Instead, the evidence was introduced to show that Robidoux's decision not to feed Samuel in the days before his death was markedly different from his decision to cut short the Maine trip. In Maine, after the expected provisions from God failed to materialize, Robidoux acknowledged that he had been deceived by a "leading," and that he had made a mistake. As a result, he ended the trip and returned home. By contrast, in the face of mounting evidence that Samuel was dying, Robidoux refused to deviate from the "leading" and alter Samuel's diet. That distinction is relevant to the Commonwealth's proof of third prong malice. If Robidoux knew that a "leading" had gone astray in the past and he had abandoned it on that occasion, he reasonably could have determined that he should have changed course to prevent his emaciated son from dying. He did not.

Additionally, evidence of the Maine trip was used to paint a picture of the events preceding Samuel's death. See *Commonwealth* v. *Bradshaw, supra.* As the judge found in denying Robidoux's motion for a new trial, the trip "was part of the movie unfolding during the time leading up to Samuel's death." It illuminated Robidoux's state of mind regarding "leadings," and demonstrated his awareness that they could be misinterpreted. See *Commonwealth* v. *DelValle, supra* at 790. The evidence also was relevant on the issue of Robidoux's motive. See *Commonwealth* v. *Carlson*, 448 Mass. 501, 509 (2007) ("Evidence of motive . . . is relevant to the issue of malice or intent"). He characterized the Maine trip as a "dry run" for "something bigger," and ultimately decided that it failed because the group was insufficiently committed to following God. That may have explained why he was so intent on restricting Samuel's diet until he died. The admission of evidence of the group's trip to Maine was not error.

6. *Post-Miranda silence.* In November, 1999, Robidoux was interviewed by local police at the Bristol County house of

correction. After being advised of his Miranda rights, he agreed to speak with the police and signed a waiver. He spoke with two officers for approximately one hour and twenty minutes, telling the officers about his impression of man's law, and how it was subservient to God's law. He also shared his impression of the police, and discussed owning various items of clothing.

Periodically during the interrogation, Robidoux was asked about his wife and deceased child. He did not answer those questions, at times stating, "I will not talk about my family," and at other times simply staring at the police officers. One of the officers present, Sergeant Robert Horman, testified to this exchange at trial. Because his testimony was not objected to at trial, our review asks whether any error created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See *Commonwealth* v. *Brown*, 449 Mass. 747, 763 (2007).

A defendant's decision to remain silent during a custodial interrogation cannot be used against him at trial, because the provision of Miranda warnings involves an implicit assurance that a defendant's exercise of his rights will not penalize him at trial. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 657 (2000), and cases cited. Here, Robidoux's claim that Sergeant Horman's testimony impermissibly infringed on his right to remain silent "fails for the simple reason that the defendant did not exercise his right to remain silent." *Commonwealth* v. *Martino*, 412 Mass. 267, 283 (1992).

Where a defendant is informed of and waives his right not to speak, he still retains the right to cut off the interrogation by reasserting his right to silence. *Commonwealth* v. *James*, 427 Mass. 312, 314 (1998). *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265 (1982). To terminate questioning, "there must be either an expressed unwillingness to continue or an affirmative request for an attorney." *Commonwealth* v. *James, supra*, quoting *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984). Robidoux did neither and simply declined to talk about certain subjects.

Robidoux's unwillingness to answer a specific type of question must be evaluated in the context of his willingness to talk to the police about other topics. See *Commonwealth* v. *Sicari*, 434 Mass. 732, 748-749 (2001) (defendant's silence of thirty to

forty minutes during lengthy interview was not invocation of right to remain silent); *Commonwealth* v. *Senior*, 433 Mass. 453, 463 (2001) (defendant's refusal to answer question concerning where he had been drinking, while answering questions both immediately prior to and subsequent to that question, did not constitute invocation of right previously waived). Robidoux's willingness to share stories and discuss his guiding principles was interspersed with refusals to talk about his family. His unwillingness to answer questions about his family in these circumstances did not manifest an expressed unwillingness to continue with the interview.[7] Where the defendant has not reasserted his right to remain silent, he cannot pick and choose which questions to answer, because "[i]f he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to." *Vitali* v. *United States*, 383 F.2d 121, 123 (1st Cir. 1967). See *Commonwealth* v. *Senior*, *supra* at 463-464, quoting *Commonwealth* v. *James*, *supra* (admission of evidence that defendant who waived right to remain silent did not answer certain police questions was proper where right was not reasserted by "expressed unwillingness to continue"). Robidoux's refusal to talk about his family, when compared to his willingness to talk about other topics, was relevant evidence of his state of mind. Cf. *Commonwealth* v. *Martino*, *supra* at 283-284 & n.12 (holding that, given detail of defendant's voluntary statement, his omissions were significant, and could be considered indicative of consciousness of guilt). The admission of Sergeant Horman's testimony was not error.

7. *Prosecutor's closing argument.* Robidoux contends, correctly, that the prosecutor misstated the law of third prong malice in his closing argument.[8] Because that misstatement did not give rise to an objection at trial, we must determine whether it

---

[7]A defendant's refusal to answer certain questions does not give rise to an obligation on the part of the police to ask a defendant whether he would like to reassert his right to silence. *Commonwealth* v. *Roberts*, 407 Mass. 731, 734 (1990). A defendant must make an express reassertion himself, and here Robidoux did not. See *id.*

[8]Malice is an element of murder. It may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or excuse, (1) the defendant intended to kill the victim (first prong), or (2) the

created a substantial likelihood of a miscarriage of justice. It did not.

The prosecutor failed to address the subjective element of third prong malice, namely, Robidoux's actual knowledge of the circumstances at the time he acted. Rather, he stated, "any reasonable person in those circumstances would know that the actions that they were taking were a clear, plain, and strong likelihood that death would follow." Contrast Model Jury Instructions on Homicide 12 (1999). The misstatement was improper but was cured by the judge's instructions. She told the jury that she would instruct them on the law, and their duty was to accept those instructions. Additionally, she instructed the jury that they were not to consider closing arguments as evidence. Most importantly, she correctly defined third prong malice.[9]

In determining whether the challenged statement created a substantial likelihood of a miscarriage of justice, we consider it "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Passley*, 428 Mass. 832, 835 (1999), quoting *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992). Additionally, the jury are presumed to follow the instructions of the judge.

---

defendant intended to do the victim grievous bodily harm (second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (third prong). *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992).

Third prong malice in cases of murder in the first degree recognizes that, although the defendant may lack the specific intent to kill, some conduct shows a depraved hardness of heart sufficient to justify a conviction of murder. "When deliberating as to the third prong of malice, a jury must consider (1) the nature and extent of the defendant's knowledge of the circumstances at the time he acted (subjective component); and (2) whether, in the circumstances known by the defendant, a reasonably prudent person would recognize that the defendant's conduct would create a plain and strong likelihood of death (objective component)." *Commonwealth* v. *Mello*, 420 Mass. 375, 389-390 (1995).

[9]The judge instructed the jury that, "under this third meaning of malice, you must determine whether based on what the defendant *actually knew* at the time he acted, a reasonable person would have recognized that his conduct created a plain and strong likelihood that death would result. In determining whether the Commonwealth has proved this third meaning of malice, you must consider the *actual knowledge of the circumstances* at the time he acted" (emphasis added). See Model Jury Instructions on Homicide 12 (1999).

*Commonwealth* v. *Degro,* 432 Mass. 319, 328 (2000). It is clear that the prosecutor's statement, taken in context with the judge's substantial and proper instructions, was harmless error. See *id.* "We view it as highly unlikely that the absence of the improper statement would have made a difference." *Id.* at 329.

8. *Review under G. L. c. 278, § 33E.* Robidoux asks this court to exercise its plenary power under G. L. c. 278, § 33E, and reduce the verdict of murder in the first degree or grant a new trial because he lacked criminal responsibility. After a complete review of the record, we decline to do so.

In *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967), we adopted the Model Penal Code's formulation for the insanity defense: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Id.,* quoting Model Penal Code § 4.01 (Proposed Official Draft 1962). Although Robidoux held unique religious beliefs, that alone is not sufficient to demonstrate a mental defect. See *United States* v. *Ballard,* 322 U.S. 78, 86 (1944) ("Men may believe what they cannot prove. . . . Religious experiences which are as real as life to some may be incomprehensible to others"). There is no evidence from lay persons or otherwise that Robidoux had a prior mental illness, or was acting on the basis of anything other than a sincerely held religious belief, and the "bizarre or inexplicable nature of a crime alone does not provide a foundation for an insanity defense." *Commonwealth* v. *Johnson,* 422 Mass. 420, 426 (1996).

Furthermore, the record is replete with evidence that Robidoux both understood the wrongfulness of his conduct and had the ability to conform his conduct to the requirements of the law. In March and April, 1999, Robidoux severely restricted his son's diet, and watched as his son exhibited symptoms of starvation. Before Samuel died, he was emaciated and barely could move. Robidoux knew that his son's dire condition was a result of his lack of nourishment, and that his only sustenance — Karen Robidoux's breast milk — was wholly insufficient. The leading, and Samuel's condition, weighed "very heavily on his heart." The

steps Robidoux took after Samuel's death are perhaps even more illustrative of his understanding of the wrongfulness of his conduct. See *Commonwealth* v. *Boateng*, 438 Mass. 498, 508 (2003) (jury may consider consciousness of guilt evidence when determining whether defendant could appreciate wrongfulness of conduct). He placed his son's remains in a homemade casket, which he then stored in the bulkhead of his sister's house for roughly four and one-half months. Later Robidoux traveled to a remote State park in Maine. With three family members, he hiked seven hours on the most primitive trail in the park, and then buried Samuel's remains more than 300 feet off the trail in dense forest. The burial site was so well concealed that canine searches and helicopter flyovers deploying infrared searching technology failed to uncover it.

Additionally, it is apparent that Robidoux had the ability to conform his conduct to the requirements of the law. He had disregarded leadings in the past, and altered course when the leadings appeared to guide him astray. When faced with Samuel's dire condition, he could have put the leading on hold. As Robidoux stated at trial, "No one can make me do anything." Regarding his responsibility for Samuel's death, he testified that "[t]he buck stops here." On this evidence, we cannot say that Robidoux lacked criminal responsibility.

*Judgment affirmed.*

*Orders denying motions for a new trial affirmed.*