NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1087

COMMONWEALTH

vs.

CHARLES UCHE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the District Court, Charles Uche (the defendant) was found guilty of assault and battery on a household member in violation of G. L. c. 265, § 13M (a).  The defendant now appeals, arguing that the trial judge improperly allowed a peremptory challenge to strike a juror in contravention of our Batson-Soares[1] framework and art. 12 of the Massachusetts Declaration of Rights.  The defendant also asserts that his trial counsel was ineffective for failing to: (1) strike unresponsive testimony; (2) request a limiting

_____

[1] See Batson v. Kentucky, 476 U.S. 79, 95 (1986), and Commonwealth v. Soares, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979), overruled in part by Commonwealth v. Sanchez, 485 Mass. 491, 511 (2020).

instruction on the jury's use of prior bad act evidence; and (3) object to portions of the Commonwealth's closing argument. We affirm.

Background. We summarize the relevant facts while reserving certain details for our discussion.

On the morning of August 26, 2022, Boston police responded to a domestic violence call at 44 Millet Street in Dorchester. The call was placed by the defendant's son, following an argument and physical altercation between the defendant and his wife. Officer Jaunasse Jean (Jean), who responded to the scene, testified that after he arrived at the residence he first met with the defendant and then spoke with the defendant's wife, who was "crying and very upset." Jean stated that the wife told him that she and the defendant got into an argument over an air fryer and that the defendant assaulted her. As a result, the defendant was subsequently arrested. Consistent with Jean's testimony, the wife testified that around 6 A.M. she was using an air fryer to prepare breakfast for her son before school. She stated that the defendant entered the kitchen and unplugged the air fryer. The wife plugged the air fryer back in and the defendant unplugged it two more times. The wife and the defendant then engaged in a verbal exchange at which point the defendant "sprained" the wife's index finger and pushed her against the wall by her neck and slapped her. The defendant was

2

subsequently indicted for assault and battery on a family or household member in violation of G. L. c. 265, § 13M (a).

During jury empanelment, the trial judge conducted a voir dire examination of juror number 17 (juror 17). The trial judge asked juror 17, who was a black male, about a felony conviction for assault and battery with a deadly weapon that he pleaded guilty to nineteen years ago and reported on his juror questionnaire. When asked by the trial judge whether he felt like he was treated fairly in that instance, juror 17 said he felt like he "got kind of duped" by the plea deal but stated that his experience would not impact his ability to be fair and impartial in this case. The trial judge also asked juror 17 about another response on his juror questionnaire. The exact questioning was as follows:

> TRIAL JUDGE: "Okay. Now let me ask the last question. I think we've already answered this. So I believe that you were -- you said -- I'm going to just quote it. 'I believe I was misled and charged by the police in court. Don't believe a fair system, but a money grab.' I think we've kind of already addressed this. I understand your views --"
>
> JUROR 17: "Yeah."
>
> TRIAL JUDGE: "-- on the system. Let me ask you this. So, first of all, every person who walks into this courtroom is entitled to their own views. Okay. Having those views about the court, do you think you could still follow my instruction?"
>
> JUROR 17: "Yes."

3

TRIAL JUDGE: "If I tell you what the law is, are you going to follow the law?"

JUROR 17: "Of course."

. . .

TRIAL JUDGE: "Is there anything about your personal background or what you've gone through, your personal life experiences, that you think would make it hard for you to be fair and impartial in this case?"

JUROR 17: "Not in this case, not at all."

Before concluding his examination of juror 17, the trial judge asked the parties if they had any additional questions. The Commonwealth asked if the judge could inquire whether the presence of police witnesses would influence juror 17 in any way. Juror 17 responded to these additional questions as follows:

TRIAL JUDGE: "So it's likely there is going to be testimony from a police officer in this case. Okay? And, again, your job as a juror is to listen to that testimony, compare it to all the other testimony, other evidence, and make a decision. Do you feel as though you can do that with an open mind."

JUROR 17: "Yes."

TRIAL JUDGE: "Do you feel like you would automatically either believe him or disbelieve him just because he's a police officer or would it depend on the testimony?"

JUROR 17: "It all depends on the facts as he presented."

The trial judge then found juror 17 to be fair and impartial and seated him on the jury. At the end of voir dire, the Commonwealth elected to exercise a peremptory challenge as

4

to juror 17.  In response, trial counsel raised a <u>Batson</u>-<u>Soares</u> challenge and asked the court to inquire of the Commonwealth its reason for striking the "minority gentleman."  The following exchange ensued:

> T<u>RIAL</u> C<u>OUNSEL</u>:  "Number 17, part of my concern and I'm trying to formulate the argument here, is he's one of the only male minorities that are on the jury list, and we went through a colloquy, and I did see the rest of the list.  The rest of the list is women, I should say.  I would request just a brief <u>Batson</u>-<u>Soares</u> challenge just so the Commonwealth can clarify that this male minority gentleman is not being excused just for either of those.  Again, you have the jury pool that I believe that he may be the only minority that was in the jury pool."
>
> T<u>RIAL</u> J<u>UDGE</u>:  "You're talking about Juror Number 17?"
>
> T<u>RIAL</u> C<u>OUNSEL</u>:  "Just Number 17."
>
> T<u>RIAL</u> J<u>UDGE</u>:  "Commonwealth?"
>
> C<u>OMMONWEALTH</u>:  "Thank you, your honor.  While that juror did say that he would be fair and impartial, his questionnaire does include statements including, I believe he was misled and charged by the (inaudible).  He does not believe -- sorry -- 'I don't believe it's a fair system, but a money grab.'  Given, though, that statement, I didn't think he'd be a suitable juror for my case."
>
> T<u>RIAL</u> J<u>UDGE</u>:  "All right.  So I credit the Commonwealth's response and I find that the challenge of Juror Number 17 was not based on his race or ethnicity or any other impermissible factor, but rather based on his answers, as well as the information contained on his questionnaire, and that that is a suitable basis for a peremptory challenge.  So the defendant's objection's noted, but the peremptory challenge is allowed."

5

Before trial, both the Commonwealth and the defendant presented motions in limine addressing potential prior bad act evidence, with the defendant seeking to exclude such evidence while the Commonwealth sought to admit evidence that included abusive statements that the defendant allegedly made to the wife throughout their relationship as well as previous physical altercations between the defendant and the wife. Though the defendant's trial counsel objected to the Commonwealth's motion, which the trial judge ultimately denied, counsel also asked that he be allowed to cross the wife regarding her contentious relationship with the defendant, stating that, "I understand that there's a rocky relationship and I think as to that part they can testify to," "I do expect that the history regarding both parties is going to come out regarding a rocky relationship during this time," and that "I do expect her [the wife] to open the door to be able to cross." The judge allowed the defendant's motion to exclude, but went on to rule that counsel could, as requested, "cross-examine regarding the relationship between the alleged victim and the defendant." The judge went on to caution that "I think the cross-examination that you're talking about is probably going to open the door to those bad

acts, but that's, I think, an issue that's going to have to be resolved on redirect."[2]

---

[2] The trial judge and the defendant's trial counsel had the following exchange:

TRIAL JUDGE:  "So I mean I think you're clearly allowed to cross-examine along those lines.  If you're essentially saying, if I hear you correctly, that the marriage was ending.  There were some financial issues, there were other issues . . . you're going to sort of suggest to the jury that these allegations were made up because it was in the context of this crumbling marriage and she has a motive to lie, something along those lines?"

. . .

TRIAL COUNSEL:  "[Y]es, your Honor, and I do expect that the door is going to be opened, but I'm just trying to alert the Court through a motion in limine that --"

TRIAL JUDGE:  "No.  I appreciate it. . . .  I think the harder question, though, is does that then open the door to prior bad acts?  Because if you're saying she's acting this way because of those reasons, I think the Commonwealth is allowed to potentially rebut that with the full context.  Again, you're certainly entitled to get into the context and the history of the relationship if it relates to her bias, but then I think that potentially opens the door to the entirety of the relationship, including the alleged prior bad acts."

. . .

TRIAL JUDGE:  "So your motion to be allowed to cross-examine regarding the relationship, that's allowed.  I mean I think clearly anything that relates to potential bias.  I'm not going to make a ruling on whether that opens the door yet because I'd like to hear the trial evidence. . . .  Again, though, I will caution you.  I think the cross-examination that

7

During the trial, the wife's answers to some of the Commonwealth's questions during her direct examination prompted objections from the defendant's trial counsel and further discussion with the judge at side bar. There, the trial judge characterized the wife's testimony as "nonresponsive" and "going well beyond the scope of the question." Following the sidebar discussion, the wife's answers continued to exceed the scope of the questions asked by the Commonwealth and the defendant's trial counsel repeatedly objected to these responses.

Likewise, during the wife's cross-examination, her responses continued to be overly lengthy and somewhat unresponsive. Portions of the wife's testimony also attacked the defendant's character and, inappropriately, mentioned instances of the defendant's prior bad behavior.[3] Id. Despite

_____

you're talking about is probably going to open the door to those bad acts, but that's, I think, an issue that's going to have to be resolved on redirect after raising it at the sidebar if you think that door has been opened."

[3] For example, when the defendant's trial counsel asked her how the power was restored to their apartment, she testified that she paid Eversource because "he [the defendant] left the home and was staying at his mistress place." In another instance, when asked if the defendant paid for her daughter's education, wife responded, "No," and then stated "[h]e [the defendant] doesn't know even where the daughter went to school." Additionally, when the wife was asked whether she ever had a conversation with the defendant about the high cost of bills, she stated "[w]e have never discussed that. The only thing he told me is that, 'Leave this place alive or dead.'"

8

the wife's overly-responsive and run-on answers, the defendant's trial counsel never moved to strike her testimony. In fact, the defendant's trial counsel seized on the testimony and questioned the wife extensively about the issues in the couple's marriage, including, but not limited to, arguments over finances and bills, and questioned her directly about the defendant's mistresses. Given the defendant's trial counsel's role in eliciting this testimony, the Commonwealth argued that the door had been opened to questions about the nature of the couple's relationship on redirect examination, including prior bad act evidence. The trial judge ultimately agreed with the Commonwealth, stating as follows:

> "the only implication of all that questioning was the defense trying to indicate to the jury that this was a woman who was either mad about all this or had some motive to lie because of these negative interactions. And I don't think it's a fair presentation of the evidence to allow the defense to get into some of that context, but then to preclude the Commonwealth from bringing these other issues. . . . I will permit the Commonwealth to ask questions about what's happened in the past. Obviously, keep it limited. We're not going to stay here for two days while she airs every grievance that she's ever had with him."

During her redirect examination by the Commonwealth, the wife testified further about the same issues in her relationship with the defendant that she was asked about during her cross-

9

examination.[4]  The trial judge, consistent with his ruling,
limited the wife's testimony on multiple occasions and
repeatedly prompted the Commonwealth to move on.  Nevertheless,
when the wife was asked whether she ever failed to pay her
portion of the bills that she divided with the defendant, she
responded "[t]here has never been a time I've not paid.  Even
when he has restraining order, I paid up to November."  Again,
the defendant's trial counsel did not object or move to strike
this testimony.  Likewise, during her recross-examination, the
defendant's trial counsel continued to press wife about prior
arguments with the defendant, his mistresses, and concerns over
the couple's finances.

Lastly, as mentioned supra, the defendant also takes issue
with trial counsel's failure to object to portions of the
Commonwealth's closing argument that referenced the wife's
testimony regarding the hostile nature of her relationship with
the defendant and the arguments they had.  The defendant also
contends that the Commonwealth's statement, "Ladies and
gentlemen, given all the testimony that you heard yesterday
regarding [the wife], what's happened to her over these years

---

[4] These issues included arguments over finances, such as
paying for their daughter's college education, derogatory names
that the defendant allegedly called the wife, and arguments over
the defendant's mistresses.

10

and what happened on August 26, 2022, I submit I have met my burden," was an impermissible propensity argument.[5]

Discussion. 1. Commonwealth's peremptory challenge. "'The Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights prohibit a party from exercising a peremptory challenge on the basis of race' or other protected classes." Commonwealth v. Sanchez, 485 Mass. 491, 493 (2020), quoting Commonwealth v. Jones, 477 Mass. 307, 319 (2017). When the defendant makes a Batson-Soares objection, it "triggers a three-step process." Commonwealth v. Henderson, 486 Mass. 296, 311 (2020). In the first step, the defendant bears the burden of rebutting the presumption that the peremptory challenge was proper. See Commonwealth v. Jackson, 486 Mass. 763, 768 (2021). To do so, he "'must make out a prima facie case' that [the challenge] was impermissibly based on race or other protected status 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" Id., quoting Johnson v. California, 545 U.S. 162, 168 (2005). Second, if such a showing is made, "the burden shifts to the party exercising the challenge to provide a 'group-neutral' explanation for it." Jackson, supra, quoting

_____

[5] The Commonwealth then stated: "I believe that I showed you beyond reasonable doubt that [the defendant] did strike his wife at the time, still his wife . . . in the neck, pushing her to the wall."

11

Sanchez, supra at 493.  "Third and finally, the judge must then determine whether the explanation is both 'adequate' and 'genuine'" (quotation and citation omitted).  Jackson, supra.  "At each step of this analysis, we review a judge's decision allowing the peremptory strike of a potential juror for abuse of discretion."  Id.

Here, the defendant, focusing on step two of the Batson-Soares framework, challenges the Commonwealth's explanation for exercising a peremptory challenge on juror 17, arguing that the Commonwealth's stated reason for the peremptory challenge was not race neutral.[6]  He also avers that the peremptory challenge violated his right to be tried by a jury of his peers under art. 12 of the Massachusetts Declaration of Rights.  We disagree.

While peremptory challenges promote a fair trial by allowing a party to eliminate jurors who may be biased, a party may exercise a peremptory challenge for any reason so long as a juror is not struck for a discriminatory purpose.  Mass. R. Crim. P. 20 (c), 365 Mass. 766 (1974).  See Commonwealth v. Soares, 377 Mass. 461, 485-486, cert. denied, 444 U.S. 881 (1979), overruled in part by Sanchez, 485 Mass. at 511.  Here,

---

[6] Although not explicitly stated on the record, the trial judge found that the defendant's trial counsel met his prima facie burden under step one when, after hearing counsel's explanation for objecting, he immediately asked the Commonwealth to explain their basis for the peremptory challenge.

the judge did not abuse his discretion in determining that the Commonwealth's use of a peremptory challenge was race neutral where the Commonwealth explained that it was striking juror 17 because of his answers during voir dire that he was "misled" by police and his juror questionnaire responses, which included the statement that he did not "believe [it's] a fair system, but a money grab."

The defendant urges that this justification was not race neutral because "a prospective juror's belief that the criminal system is unfair is unavoidably intertwined with their race." This argument has some facial appeal, though ultimately it is not persuasive. To begin, the Supreme Judicial Court has recognized that members of "specific identified groups," such as racial groups, may have "differing attitudes" towards the administration of justice and that such views enhance rather than hinder the jury deliberation process. Soares, 377 Mass. 461, 486 & n.30 (1979). Additionally, the Supreme Judicial Court has concluded that it is impermissible to disqualify prospective jurors based solely on their belief that the criminal justice system is unfair to Black Americans. See Commonwealth v. Williams, 481 Mass. 443, 446 (2019), citing Mason v. United States, 170 A.3d 182, 187 (D.C. 2017). See also id. at 461 (Gants, C.J., concurring) ("[s]tanding alone, the belief that the criminal-justice system is systemically unfair

13

to blacks is not a basis to disqualify a juror" [quotation omitted]).

Here, however, juror 17 explained that his feelings about the criminal justice system were informed by a past personal encounter with the police. At no point did juror 17 state that his feelings about the justice system were due to his race, and, given his explicit responses, we do not glean such a sentiment from the record. Therefore, where the Commonwealth cited these explicit responses from juror 17 as justification for their use of a peremptory challenge, we discern no abuse in discretion in the trial judge's determination that "the challenge of Juror Number 17 was not based on his race or ethnicity or any other impermissible factor." See Jackson, 486 Mass. at 768. Likewise, because juror 17 was not struck for a discriminatory purpose, the defendant's right to be tried by a jury of his peers under art. 12 was not violated. See Sanchez, 485 Mass. at 493.

2. Ineffective assistance of counsel. The defendant also argues that his trial counsel was ineffective for failing to: (1) strike the wife's unresponsive testimony; (2) request a limiting instruction on the jury's use of prior bad acts evidence; and (3) object to the Commonwealth's closing argument. The arguments are unavailing.

14

Counsel is ineffective when "(1) 'there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinarily fallible lawyer'; and (2) as a result, the defendant was 'likely deprived . . . of an otherwise available, substantial ground of defence.'" Commonwealth v. Henley, 488 Mass. 95, 134 (2021), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). The burden of proving an ineffective assistance claim is on the defendant. Commonwealth v. Montez, 450 Mass. 736, 755 (2008).

When the ineffective assistance claim is "based on a tactical or strategic decision, the test is whether the decision was 'manifestly unreasonable' when made." Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), quoting Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006). Manifestly unreasonable decisions refer only to "strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent." Kolenovic, supra, quoting Commonwealth v. Pillai, 445 Mass. 175, 186-187 (2005).

a. Failure to strike and request a limiting instruction. Here, the defendant's trial counsel's defense strategy was to discredit the wife's testimony by exposing her bias and motivations to lie about her accusations against the defendant. To effectuate this strategy, trial counsel elicited testimony

15

from the wife detailing her volatile and often hostile relationship with the defendant leading up to the physical altercation on August 26, 2022.  Given that the outcome of the trial essentially turned on the credibility of the testimony from the wife and the defendant respectively, we cannot say that the defendant's trial counsel's strategy to undermine the wife's credibility was manifestly unreasonable.  Kolenovic, 471 Mass. 674.  We also discern no abuse of discretion in the trial judge's ruling that the wife's cross-examination did in fact "open the door" to the admission of some prior bad act evidence and we agree that the Commonwealth was appropriately "entitled to give a fuller context of what led up to this incident."[7]  See Commonwealth v. Smiley, 431 Mass. 477, 484 (2000) ("whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge").  Therefore, we cannot say that the defendant was "deprived . . . of an otherwise available, substantial ground of

---

[7] The defendant strenuously argues that his trial counsel was ineffective for failing to strike the wife's unresponsive answer during redirect examination when she referenced a restraining order.  However, the wife's exact statement, "Even when he has restraining order, I paid up to November[,]" does not indicate which party the order applied to or for what reason the order was granted.  Moreover, the restraining order was not mentioned again during trial.  Therefore, trial counsel's failure to strike this testimony did not unduly prejudice the defendant.  See Commonwealth v. Millien, 474 Mass. 417, 430-433 (2016) (discussing meaning of prejudice in the context of an ineffective assistance claim).

16

defence," Henley, 488 Mass. at 134 (quotation omitted), where the defendant's trial counsel knew that his strategy could open the door to the admission of such prior bad act evidence, and where such evidence was properly admitted.[8]

b. Commonwealth's closing argument. The defendant also asserts that his counsel was ineffective for failing to object to the Commonwealth's closing argument, which referenced prior bad acts elicited through the wife's trial testimony and purportedly used an impermissible propensity argument. We are not persuaded.

"[W]hen the claim of ineffectiveness is predicated, as it is here, on counsel's failure to object to something that occurred at trial, the standard for evaluating the ineffectiveness claim is not significantly different from the substantial risk standard that is applicable to our review of the underlying, unpreserved error." Commonwealth v. Azar, 435 Mass. 675, 686 (2002). We consider the challenged statements "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Robidoux, 450 Mass. 144, 162 (2007), quoting Commonwealth v. Passley, 428 Mass. 832, 835 (1999).

---

[8] We also note that the trial judge continually limited the wife's unresponsive testimony during her redirect and recross examinations.

Here, we discern no error in trial counsel's failure to object to the Commonwealth's closing statement. In closing, the Commonwealth broadly referenced "things that were said during the course of the relationship," "name-calling," "arguments about finances," and "issues going on." Finally, the Commonwealth stated: "given all the testimony that you heard yesterday regarding [the wife], what's happened to her over these years and what happened on August 26, 2022, I submit I have met my burden." At no point did the Commonwealth intentionally venture outside of the evidence, and any reference to the wife and the defendant's past relationship was squarely grounded in testimony that the defendant's trial counsel elicited or opened the door to during trial. See Robidoux, 450 Mass. at 162. Accordingly, the defendant's claim that his trial counsel was ineffective for failing to object to the Commonwealth's closing argument is also unavailing.

Judgment affirmed.

By the Court (Henry, Desmond & Englander, JJ.[9]),

Clerk

Entered: April 17, 2025.

---

[9] The panelists are listed in order of seniority.

18