## Commonwealth *vs.* Margaret A. Earle.

Plymouth. September 13, 2010. - November 18, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Practice, Criminal,* Required finding. *Homicide. Wanton and Reckless Conduct. Malice.*

At the trial of a murder indictment against the mother of a twenty-one month old child who died of peritonitis as a result of a severed intestine, the evidence, which did not support a reasonable inference that the defendant saw the infliction of the trauma that the victim suffered, was legally insufficient to support a verdict of murder in the second degree, where the testimony presented by the Commonwealth fell short of demonstrating that a person without medical training would necessarily be expected to appreciate the high likelihood of death associated with the symptoms that the victim displayed. [346-352]

The evidence at a murder trial was plainly insufficient to establish that the defendant intended to kill the victim. [352-353]

Indictment found and returned in the Superior Court Department on June 6, 2002.

The case was tried before *Linda E. Giles,* J., and a motion for a new trial, filed on July 22, 2009, was considered by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael R. Schneider* for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

Cowin, J. In 2005, the defendant was convicted by a Superior Court jury of murder in the second degree for the death of her twenty-one month old daughter, who died in March, 1985. We allowed the defendant's application for direct appellate review. The defendant claims on appeal that (1) the evidence of malice was legally insufficient; (2) the Superior Court judge erred in refusing to give a manslaughter instruction; (3) the prosecutor's closing arguments created a substantial risk of a miscarriage of

justice; and (4) the judge erred in denying the defendant's motion for a new trial without a hearing. We conclude that the evidence of malice was legally insufficient to support a conviction of murder in the second degree and therefore reverse the defendant's conviction. Accordingly, we need not reach the remaining issues raised on appeal.[1]

1. *Facts.* Because this case raises a question of sufficiency of the evidence, we summarize the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), reserving a discussion of some of the details for our analysis of the issues raised on appeal.

On March 7, 1985, the victim died as a result of blunt force trauma to her abdomen that severed her small bowel, setting in motion a bacterial process that led to organ failure and death. At that time, the defendant was living in a two-bedroom apartment in Brockton with her boy friend and her cousin.

Medical testimony placed the estimated time of trauma between approximately midday on March 6, 1985, and the morning of March 7.[2] On the evening of March 6, the defendant's upstairs neighbor, Susan Lewis, invited the defendant to celebrate her twenty-first birthday. The defendant went to Lewis's apartment at about 9 P.M. She left the victim with her boy friend. When the defendant returned to her apartment at about 11:10 P.M., she saw her boy friend holding the victim in the bathroom because the victim was sick and vomiting; he told the defendant that the victim had begun vomiting about ten minutes earlier. The defendant saw that the sheets in the crib were stained. She cleaned the crib and put the victim back in it. The victim was then up "all night getting sick" and experiencing stomach pain.

The next morning, while it was still dark, the defendant's

---

[1]The defendant may not be retried for manslaughter. The statute of limitations period for manslaughter, six years, has expired. See G. L. c. 277, § 63.

[2]It was shortly after 2:40 P.M. on March 7, 1985, that the pediatrician who testified at trial saw the victim arrive at the Brockton Hospital emergency room with no life signs. The victim was pronounced dead at approximately 3:15 P.M. The pediatrician testified that the trauma would have been "within twenty-four hours" of death. The forensic pathologist who examined the victim at the autopsy placed the time between trauma and pronouncement at twenty-four hours, "plus or minus . . . a few hours." The medical examiner estimated that the injuries were "[s]omewhere between six and twenty hours" old.

cousin awoke to the sound of the victim crying. He noticed that "[the victim's] color was way off." He observed that her skin tone was a "greenish-blue or greenish-gray," and that she was whimpering. He was concerned and informed the defendant, who was still in bed, that the victim appeared to be sick.

Sometime before 8 or 8:30 A.M., the defendant placed a telephone call to a friend, who heard the victim crying. At 9:30 A.M., the defendant received a telephone call from her sister, who heard the victim whimpering. The defendant told her sister that the victim appeared to be sick and had been vomiting a green substance; that she was listless and seemed to be in considerable pain around her abdomen; that she would react and hold her stomach when touched; and that she would whimper when picked up. At that point, the defendant heard the victim "crying, Mama," and observed her spitting up a green mucus. The defendant then changed the victim's pajamas. At some point during the morning, the defendant also changed the victim's diaper and observed "watery diarrhea."

At around 10:45 A.M., Lewis's daughter, thirteen year old Colleen Jones, went to the defendant's apartment to use the telephone. Jones observed the victim on the couch in her pajamas, faintly "moaning and groaning," and she saw that the victim had a bruise on her cheek. The defendant was on the telephone with a friend, and asked Jones to walk to that friend's house to retrieve a bottle of ginger ale for the victim. Jones did so, and brought the ginger ale to the defendant at around 11:10 or 11:25 A.M. Jones then left the apartment.

The defendant's telephone records indicate that a single, four-minute telephone call was placed from her telephone number to the victim's doctor's office, at noon. There was evidence at trial that the defendant had told both her sister and one of her friends, during calls prior to noon, that she had already spoken to the doctor's office and had been told that it sounded as if the victim had "the flu."

At around noon, Jones saw the defendant in the hall. The defendant asked Jones to babysit the victim at an unspecified time that day so that the defendant could go to a local drug store. Jones returned to the defendant's apartment at around 2 P.M. with a friend to babysit, and observed that the victim was still on the

couch and did not appear to have moved since Jones had last seen her. Jones observed that the victim's face had a yellow discoloration, and that she had a cut on her upper lip and a bruise on her cheek.[3]

After the defendant left for the drugstore, Jones heard the victim "moaning and groaning," and at one point noticed that the victim had vomited a thick yellow substance. Approximately thirty minutes after the defendant left, Jones observed that the victim was quiet. Jones rolled her onto her back and a "yellow-ish green" substance came from the victim's mouth. Jones saw that the victim was not breathing and screamed for her mother, Lewis, who was in the upstairs apartment. Lewis arrived, performed mouth-to-mouth resuscitation, and had her daughter telephone 911. Lewis observed that the victim was "[y]ellowish" in color, had a cut on her lip, and was bruised.

Officer Ricardo Froio of the Brockton police department arrived at the victim's apartment soon after 2:42 P.M. and performed cardiopulmonary resuscitation on her.[4] He observed that her stomach was distended and swollen. Detective Thomas Enos entered the apartment at the same time as Officer Froio and saw that the victim's skin was waxy and discolored, that she had a cut and bruising around her lip, and that she had either cuts or bruises on her cheek and forehead. He also noticed that her stomach was swollen and very hard. Officer Gail Bowers also arrived at about the same time and saw "lividity . . . on the bottom" of the victim, a bruise on her left temple, and black and blue marks on the lower part of her body.

The forensic pathologist who performed the autopsy a few hours after the victim was pronounced dead noted contusions of the left forehead, left eye, and chin; three contusions of the right cheek; an abrasion of the upper lip; contusions of the left shoulder, of the right flank, and just above the navel; three "abrasion contusions" of the right middle back; and a bruise of the left thigh. All the bruising was from before the victim's

[3]It was ambiguous whether the cut on the victim's lip was fresh in the afternoon; there was no direct testimony on that question.

[4]There is an apparent inconsistency in testimony regarding the timing of Officer Froio's arrival at the victim's apartment and the victim's subsequent arrival in the emergency room. See note 2, *supra.* That inconsistency does not bear on the resolution of the case.

death. The pediatrician who saw the victim when she arrived at the emergency room observed a similar set of bruises, and also recalled bruises on the victim's left wrist and the left side of her abdomen. He stated that all the bruising was from "within a twenty-four hour period" of her death.[5]

The pathologist also testified that the victim's stomach was noticeably distended, and that there was a great deal of resistance when it was palpated. The emergency room physician likewise observed that the abdomen was "quite bloated" and rigid to the touch. In his internal examination, the pathologist noted two fractured ribs and internal hemorrhaging, and discovered a transection of the small bowel that caused peritonitis and, ultimately, the victim's death.

Medical testimony established the symptoms that would typically be observed in a child suffering from peritonitis as a result of a severed intestine. Initially, the child would experience pain and fever, would refuse to eat, and would likely vomit. Over time, the child's abdomen would start to distend and the child would refuse to walk because of the pain it would cause. With the progression of peritonitis, the child might assume a fetal position to take pressure off the abdomen, and the child would move around less to avoid painful muscle contractions. The pain would be "excruciating," and as it might hurt to cry, the child might moan or whimper. Over time, the fever would grow more severe, and the child might become lethargic, experience loss of sensorium, and perhaps have hallucinations. This deterioration would be gradual.

The distention of the child's abdomen would also be gradual. The emergency room physician testified that he would expect the process leading to distention to begin within four to six hours of injury, with the abdomen becoming clearly distended by twelve hours. The medical examiner testified that the abdomen would probably be "board-like" within nine hours of the injury.

Years after the victim's death, in December of 1995, the defendant's boy friend told his then wife that on March 6, 1985, he had thrown the victim down and stomped on her stomach

---

[5]The pathologist testified that he thought all the bruises were about the same age, and that they were less than four days old. The medical examiner, who was present for the autopsy, testified that he thought the bruises were of different ages, some within twenty-four hours and others several days old.

twice; each time he stomped on the child, he had "squished and squished" her.[6]

2. *Discussion.* As noted, in challenges to the sufficiency of the evidence introduced at trial, we review the evidence under the familiar standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Evidence is sufficient to reach the jury, and a motion for a required finding of not guilty is properly denied, where the evidence, viewed in its light most favorable to the Commonwealth and drawing all inferences in favor of the Commonwealth, would permit a rational jury to find each essential element of the crime beyond a reasonable doubt. *Id.* The inferences drawn from the evidence must be reasonable and cannot require "conjecture and speculation," *Commonwealth* v. *Merry*, 453 Mass. 653, 661 (2009), quoting *Corson* v. *Commonwealth*, 428 Mass. 193, 197 (1998), but they "need not be necessary or inescapable," *Commonwealth* v. *Lodge*, 431 Mass. 461, 465 (2000), quoting *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998).

The elements of murder in the second degree are (1) an unlawful killing and (2) malice. See Model Jury Instructions on Homicide 20 (1999). Malice can be established by proving any of three facts, or "prongs": (1) the defendant intended to cause the victim's death; (2) the defendant intended to cause grievous bodily harm to the victim; or (3) the defendant committed an intentional act which, in the circumstances known to the defendant, a reasonable person would have understood created a plain and strong likelihood of death.[7] See *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). The principal question in the present case is whether the Commonwealth's evidence is legally sufficient to prove malice.

a. *Third prong malice.* The Commonwealth argued at trial

---

[6]The investigation of the victim's death remained open until 2002, when various inculpatory statements by the defendant's boy friend culminated in his arrest. He was convicted by a Superior Court jury of murder in the first degree by extreme atrocity and cruelty. We affirmed the conviction. See *Commonwealth* v. *Burnham*, 451 Mass. 517, 518-520 (2008). The defendant was indicted on June 6, 2002.

[7]Murder in the first degree (other than felony-murder) is distinguished from murder in the second degree by requiring, in addition to an unlawful killing and malice, either "extreme atrocity or cruelty" or "deliberate premeditation." See Model Jury Instructions on Homicide 6, 20 (1999).

that the defendant's conduct satisfied the standard for third prong malice, that is, that a reasonable person would have known, given the symptoms of the victim seen by the defendant, that the failure to seek appropriate medical attention for her created a plain and strong likelihood of her death. Of particular importance in the present case is the distinction between this standard for third prong malice and the standard for involuntary manslaughter — a lesser included offense of murder. See *Commonwealth* v. *Woodward*, 427 Mass. 659, 669 (1998). Involuntary manslaughter is an unintentional, unlawful killing caused by wanton or reckless conduct.[8] See *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 747 (1975). Wanton or reckless conduct is "intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). The degree of risk of physical harm for involuntary manslaughter is thus "a high degree of likelihood" of "substantial harm," whereas for third prong malice there must be a "plain and strong likelihood of death."[9] The question, therefore, is whether this higher burden was established in the present case.

As a general proposition, both the murder and involuntary manslaughter standards can be satisfied by a defendant's omission where the defendant has a duty to act. Thus, as a parent has a duty to provide for the care and welfare of his or her child, see *Commonwealth* v. *Gallison*, 383 Mass. 659, 665 (1981), a failure to discharge that duty can be rendered criminal if the defendant parent had the means to perform it and, depending on

---

[8]A second standard for involuntary manslaughter involving the commission of a battery is not relevant here. See *Commonwealth* v. *Sneed*, 413 Mass. 387, 393-394 (1992).

[9]There are objective and subjective aspects of both third prong malice and the wanton and reckless conduct element of involuntary manslaughter. Malice can be found if, in the circumstances subjectively known to the defendant, a reasonably prudent person would have known of the plain and strong likelihood that death would follow a contemplated act. See *Commonwealth* v. *Grey*, 399 Mass. 469, 472 n.4 (1987), citing *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981). Similarly, for wanton and reckless conduct, the relevant inquiry is whether a defendant knew of facts that would cause a reasonable person to know of the relevant danger, or whether the defendant in fact knew of the danger. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 398 (1944).

the circumstances, can constitute murder or involuntary manslaughter. See *Commonwealth* v. *Hall*, 322 Mass. 523, 529 (1948).

The contours of third prong malice (necessary for a conviction of murder in the second degree) and those of involuntary manslaughter — and the evidence sufficient to satisfy those standards in parental omission cases — are most clearly illuminated by examining our prior cases. Therefore, we begin by discussing murder cases. Both murder in the first degree and murder in the second degree share the same definition of third prong malice and thus the same required risk of death as is applicable in the present case. We proceed in turn to discuss a relevant involuntary manslaughter case. We conduct this examination in order to compare the present case to our past decisions and determine where on the spectrum the present case falls.

In *Commonwealth* v. *Fickling*, 434 Mass. 9, 9-10 (2001) (*Fickling*), the defendant was convicted of murder in the first degree for having asphyxiated the mother of his twenty-two month old child. The defendant was also convicted of murder in the first degree for the death of the child, who was left alone in the apartment with her dead or dying mother. See *id.* at 9-10, 14. The apartment door and accessible windows were locked, and the child died of starvation and dehydration. See *id.* at 10-11, 14. The Commonwealth argued that the defendant had abandoned the child in circumstances that he reasonably would have known would result in her death, and this court affirmed the conviction. See *id.* at 14. The isolation of a toddler in an apartment while withholding food and liquids thus presents the kind of "plain and strong likelihood of death" required for third prong malice.

We likewise affirmed a conviction of murder in the first degree in *Commonwealth* v. *Robidoux*, 450 Mass. 144, 145-146 (2007) (*Robidoux*). There, the defendant, the father of a ten month old child, restricted the child's diet to breast milk and water on the "leading" of a fellow religious group member. See *id.* at 145, 148-149. After a day of the new diet, the defendant began to question the "leading" and supplemented the child's diet with almond milk, but stopped doing so when told by a group elder that it was contrary to God's will. Once on the diet, the child's bones became visible, his eyes appeared sunken, and he no longer crawled or sat up. The child's mother became so distressed by

the child's appearance that she would no longer bathe him. As weeks passed, the skin on the child's chest turned dark, his eyes would at times roll up into the back of his head, and he could no longer hold himself up. The child died. See *id.* at 149. On appeal, this court affirmed the defendant's conviction.[10] See *id.* at 145-146. Depriving a child of solid food while observing the child's resulting starvation is, again, an illustration of circumstances presenting a "plain and strong likelihood of death."[11]

We turn now to a prior involuntary manslaughter case with distinct facts similar to the present case. As involuntary manslaughter is a lesser included offense of murder in the second degree, evidence that has been determined to fall short of proving involuntary manslaughter is a helpful indicator of evidence that clearly would be insufficient to prove third prong malice. In *Commonwealth* v. *Michaud*, 389 Mass. 491, 493-495 (1983) (*Michaud*), a husband and wife were found guilty by a jury of involuntary manslaughter for the starvation death of their infant daughter. We reversed the conviction on appeal. See *id.* at 499. Evidence in the record indicated that the parents had not sought medical care for the child until they discovered that the child was not breathing, and that the child appeared to be dead upon arrival in the emergency room. See *id.* at 493, 495. In autopsy photographs, the baby's ribs and spinal column were visible, and her cheeks and eyes appeared somewhat sunken. See *id.* at 494, 498. A babysitter testified that the child looked paler in the days leading up to her death, and the emergency room physician and medical examiner testified to her thin and malnourished appearance. See *id.* at 495, 498.

We determined, however, that there was no evidence to show that the child's deterioration had been a steady process, rather than a "sudden event over a short time span," and noted that the parents had testified that they had not noticed anything

[10]Although we did not discuss sufficiency of the evidence in *Commonwealth* v. *Robidoux*, 450 Mass. 144 (2007), given our duty to review the entire record in capital cases, see G. L. c. 278, § 33E, our affirmance implied that the evidence was sufficient.

[11]Although there was no explicit statement of the theory of malice that supported the verdict, the appeal focused in part on the accuracy of the prosecutor's and judge's descriptions of third prong malice. See *Commonwealth* v. *Robidoux, supra* at 161-162.

wrong with the baby other than that she was eating less in the final week of her life. *Id.* at 498. We concluded that, although arguably the parents had been negligent when measured by a standard of reasonable parents, recklessness required "more than a mistake of judgment or even gross negligence." *Id.* at 499.

The murder convictions affirmed in *Fickling* and *Robidoux*, and the reversal of the manslaughter conviction in *Michaud*, help to define the parameters for resolving the issue before us. The *Fickling* and *Robidoux* cases demonstrate the type of "plain and strong likelihood of death" that we have required for a conviction of murder based on third prong malice. The *Michaud* case illustrates a fact pattern more appropriately addressed by the lesser involuntary manslaughter standard; indeed, it is a case in which the evidence was held insufficient to meet that standard. Unlike the murder cases, in *Michaud* there was a degree of uncertainty as to what the parents would have seen or appreciated, and we noted that mere mistake of judgment or gross negligence did not satisfy the manslaughter standard. There is a higher standard still for a conviction of murder. We conclude that the evidence in the present case does not satisfy the standard for third prong malice.

As a threshold matter, the evidence here does not support a reasonable inference that the defendant saw the infliction of the trauma.[12] As such, for the conviction to be affirmed, the defendant must have become aware, at some point between the time of trauma and the victim's death, of symptoms that would alert a reasonable person to an ailment that carried a plain and strong likelihood of death. Even assuming, arguendo, that the jury could infer that the defendant observed bruises on the victim's torso and swelling of the victim's abdomen during the morning hours, a person without medical training could not necessarily be expected to appreciate the high likelihood of death associated with those symptoms. The symptoms do not present the apparent level of risk associated with, for example, abandoning a toddler in an apartment without providing sustenance, as in

---

[12]The Commonwealth's evidence that the defendant was drinking "[p]retty fast" and that she was not "festive" when she visited Susan Lewis's apartment on the night of the victim's death falls markedly short of supporting an inference that the defendant saw the infliction of the trauma.

*Fickling,* or depriving a child of solid food despite his apparent starvation, as in *Robidoux.* Finding a strong likelihood of death in those circumstances requires no differential diagnosis of symptoms; it would be plain to a reasonable person.

Although the Commonwealth presented medical testimony on the hypothetical question what a lay person would normally understand about the symptoms associated with peritonitis, that testimony was insufficient to satisfy the Commonwealth's burden. The medical witnesses stated that a lay person would know the symptoms were "abnormal"; that a reasonable caretaker would not mistake full peritonitis for influenza; and that it would be obvious that the child was "very, very sick, and need[ed] attention." They also testified that, taking account of symptoms in the end stages, a reasonable person would know that the child was "in severe dire straits," and that as the child went into septic shock, a person without medical training would know the child was "in grave danger or critically ill." Without reaching the question whether a jury could infer from the facts that the defendant would have witnessed the relevant symptoms in the "end stages" or during septic shock, we conclude that the observations described by the medical experts would fall short of third prong malice.

As we have made clear, it is not enough to show that this defendant failed to seek medical care where a reasonable person would know that failing to do so would create a strong likelihood of grievous bodily harm. See *Commonwealth* v. *Russell,* 439 Mass. 340, 344-346 (2003). Nor is it enough to establish that the victim was so ill that her death was a possibility. The testimony must support the inference of a plain and strong likelihood of death, and on that point the medical testimony was insufficient.

Indeed, the limited medical testimony specifically addressing the apparent likelihood of death supported the opposite inference. When the forensic pathologist was asked whether it would be apparent to a lay person that the injury was fatal or that the victim was dying, he indicated that it would not.[13] Likewise, the pediatrician who saw the victim in the emergency room testified

[13]When asked whether it would be obvious or apparent to a lay person that the victim was dying, the pathologist answered, "Well, maybe not dying but severely ill." When asked if a lay person would know that what was occurring was fatal, he answered, "No, but the lay person would know it's serious."

that it was on account of his medical education that he understood bruising of the abdomen to be potentially indicative of a significant internal injury, and green vomit to be indicative of infection or blockage in the abdomen.

The Commonwealth lacked other evidence on which a finding of malice could be based. The reactions of the witnesses who saw the victim in the hours prior to her death would not support a finding of malice, as neither the cousin, who testified to changing the victim's diaper that morning, nor Jones, who saw the victim at various times during the day, reacted to the victim's appearance as that of a child who was likely to die.

It may well be true that the defendant's failure to take the victim to the hospital despite her symptoms was wanton and reckless conduct creating a high degree of likelihood of substantial harm to the victim, and that the defendant's conduct would thus support her conviction of involuntary manslaughter. We need not resolve that question here because the period for prosecution of the defendant for manslaughter has expired. See note 1, *supra.* But to hold, on the facts of this case, that the defendant's omission is legally sufficient to convict the defendant of murder would expand the concept of murder as it has been understood in the Commonwealth. We decline to do so.

b. *First prong malice.* The Commonwealth argues also that the defendant intended to kill the victim, thus satisfying the first prong of malice.[14] The evidence of the defendant's intent to cause the victim's death is plainly insufficient and can be addressed more briefly.

The Commonwealth presented evidence from which a jury could infer that the defendant lied to a police detective in saying she had never seen her boy friend strike the victim before, and that she gave various speculative or inaccurate accounts of the victim's death to other people. There was also evidence of prior injuries to the victim and poor care: the victim had been taken to the hospital for a fall from a car seat when she was one month of age; the defendant dropped the victim down a flight of stairs at the age of three months, after which it appears the

---

[14]The Commonwealth has not formally abandoned a theory of second prong malice, but does not address its arguments specifically to the sufficiency of the evidence in regard to that theory. In any event, the discussion here applies with equal force to a theory of second prong malice.

defendant did not take her to the hospital; and at the age of sixteen months, the victim was admitted to the hospital for lethargy, unsteadiness, and persistent crying. In this latter episode, the defendant said she suspected the symptoms resulted from furniture polish ingestion, a cause doubted by the attending doctor. On one occasion, the defendant was allegedly overheard at a party saying, regarding an incident in which the victim drank from a bottle of Visine, "too bad she didn't drink the whole bottle."

None of that evidence, nor its sum total, could support a reasonable inference that the defendant intended the victim's death on March 7, 1985. Nor, more obviously, could the jury infer such intent from the Commonwealth's evidence that the defendant frequently hired babysitters so that she could attend parties, or from evidence of her alleged "pleasure-seeking narcissism."

3. *Conclusion.* As the evidence in this case was legally insufficient to support a verdict of murder in the second degree, the judgment of conviction is reversed, the verdict is set aside, and the case is remanded to the Superior Court for entry of a required finding of not guilty.

*So ordered.*