## COMMONWEALTH *vs.* CAROLYN RILEY.

No. 11-P-846.

Plymouth. January 11, 2013. - September 20, 2013.

Present: COHEN, GREEN, & VUONO, JJ.

*Homicide. Evidence,* Scientific test, Prior misconduct. *Malice.*

At the trial of an indictment charging the defendant with murder in connection with the death of her daughter from an overdose of clonidine, there was no error, and therefore no substantial risk of a miscarriage of justice, resulting from the admission in evidence of the testimony of the Commonwealth's forensic toxicologist, where there was no indication that the toxicologist based his testimony on the results of ostensibly unreliable post mortem blood tests, as alleged by the defendant [273-276]; further, even if the jury obtained the erroneous impression that the amount of clonidine could be extrapolated with precision from the victim's post mortem blood concentration levels, the defendant suffered no prejudice, given the overwhelming evidence supporting the conclusion that the victim suffered a clonidine overdose regardless of the precise amount administered before her death [276-277].

At the trial of an indictment charging the defendant with murder in connection with the death of her four year old daughter from the defendant's intentional and repeated administration of clonidine in excess of what was prescribed, despite having been told that doing so could be fatal, the evidence was sufficient to prove third prong malice, and the jury were properly instructed on that form of malice. [277-284]

There was no merit to a criminal defendant's allegation that certain evidence admitted at trial depicting her behavior was irrelevant and prejudicial. [284-285]

INDICTMENT found and returned in the Superior Court Department on March 23, 2007.

The case was tried before *Charles J. Hely*, J.

*Chrystal A. Murray* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

COHEN, J. A grand jury returned indictments charging the

defendant, Carolyn Riley, and her husband, Michael Riley, with murder in the first degree in connection with the December, 2006, death of their four year old daughter, Rebecca, from an overdose of clonidine and other medications administered to her by her parents. After this court determined that the evidence before the grand jury was sufficient to sustain the indictments, see *Commonwealth* v. *Riley,* 73 Mass. App. Ct. 721, 722-726, 729-731 (2009), the defendant and her husband were tried separately in the Superior Court. In the defendant's case, the jury returned a verdict of guilty of the lesser included offense of murder in the second degree.[1] She appeals, arguing that (1) the judge erroneously admitted the testimony of the Commonwealth's forensic toxicologist without conducting a *Daubert-Lanigan* hearing;[2] (2) the evidence was insufficient to prove third prong malice and, hence, the jury should not have been instructed on that form of malice; and (3) the judge erroneously allowed prejudicial character evidence to be admitted. Discerning no merit in these arguments, we affirm.

The facts that the jury could have found are not significantly different from those presented to the grand jury and are well summarized in *Commonwealth* v. *Riley, supra* at 722-726. We refer to relevant trial evidence and procedural facts in conjunction with our discussion of the issues raised.

1. *Testimony of Commonwealth's forensic toxicologist.* Before trial, the defendant filed a motion in limine seeking a *Daubert-Lanigan* hearing on the scientific reliability and admissibility of the testimony of Dr. George S. Behonick, who, at the time of Rebecca's death, was the director of forensic toxicology at the University of Massachusetts Memorial Medical Center in Worcester. The defendant's challenge was predicated on the assumption that Dr. Behonick would opine as to the amount of clonidine consumed by Rebecca prior to her death based upon the level of clonidine found in her blood post mortem. According to the defendant, because clonidine is subject to the phe-

---

[1]Michael Riley was convicted of murder in the first degree on the theory of extreme atrocity and cruelty. His appeal is pending before the Supreme Judicial Court.

[2]See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan,* 419 Mass. 15 (1994).

nomenon known as "post mortem redistribution," post mortem blood levels of the drug would not be a reliable indicator of the amount administered ante mortem.

At a pretrial hearing, defense counsel referred to the motion in limine, and two days later, after the jury had been empanelled but before the trial began, argued that the defendant was entitled to a *Daubert-Lanigan* hearing. After considering the argument, the judge stated that he would "rule on this during the course of the trial." At trial, however, counsel did not renew the argument that Dr. Behonick's testimony should be excluded as unreliable. Counsel did not object to the witness's testimony on reliability grounds, nor did he move to strike the testimony after it was received.

Ordinarily, we review *Daubert-Lanigan* rulings for abuse of discretion. See, e.g., *Commonwealth* v. *Avila*, 454 Mass. 744, 764 (2009). Here, however, the defendant did not adequately preserve the issue for appellate review. Contrast *Commonwealth* v. *Gambora*, 457 Mass. 715, 723 (2010); *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 836 (2011). Accordingly, we review only to determine if there was any error in the admission of Dr. Behonick's testimony, and, if so, whether the error created a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Jones*, 464 Mass. 16, 18 (2012). We conclude that there was no error if only because, contrary to the defendant's claim, Dr. Behonick did not use post mortem drug levels to determine the dose of clonidine administered to Rebecca before her death, and did not testify to any such analysis or calculations.

Dr. Behonick testified that he had received a variety of samples from the autopsy performed on Rebecca, including samples of her blood. Because his laboratory did not have the ability to accurately test for clonidine, he sent blood samples taken from Rebecca's heart to a highly regarded laboratory in Pennsylvania. When the results were returned they indicated the presence of nineteen nanograms of clonidine per milliliter of heart blood, a level that Dr. Behonick described as excessive and toxic, prompting him to request additional testing of a peripheral blood sample.

Dr. Behonick explained the widely understood phenomenon known as "post mortem redistribution" whereby, after death, a

drug may diffuse from other organs, like the lungs or the liver, and artificially raise the concentration of the drug in the heart. He further explained that forensic toxicologists recognize this effect on heart blood and have determined that the most accurate concentration of the drug is likely to be detected in a peripheral sample such as iliac blood or femoral blood. For that reason, he requested that the Pennsylvania laboratory perform additional testing on Rebecca's femoral blood. That testing revealed the presence of twelve nanograms of clonidine per milliliter of femoral blood.

To put this number in context, Dr. Behonick was asked by the prosecutor to calculate the level of clonidine that likely would have been in Rebecca's blood had she been alive and taken her entire prescribed daily dose at one time. Based on Rebecca's body weight and the amount of the prescribed dose, Dr. Behonick explained that there is a mathematical formula, widely accepted in the medical community, for performing this calculation. He applied this formula to Rebecca's daily prescribed dose and used her body weight at death to conclude that the clonidine level would have been between four and seven nanograms per milliliter. Using the same formula, Dr. Behonick further explained that if the dose had been doubled, the clonidine level in the blood also would have doubled and would have been between eight and fourteen nanograms per milliliter.

During cross-examination, Dr. Behonick made clear that none of the hypothetical ante mortem calculations he presented relied upon the post mortem clonidine level, stating: "I am not back calculating. . . . It was not a retrograde calculation." He readily acknowledged that after death there is a dynamic that can alter drug concentration levels in blood and explained that forensic toxicologists try to take those fluctuations into account by, for example, obtaining femoral blood to test, rather than heart blood. He emphasized, however, that his prospective calculations were based entirely on a known dose and a known body weight and were completely independent of any post mortem blood concentration level. In other words, the premise of the defendant's motion in limine — that Dr. Behonick would testify to the amount of clonidine administered to Rebecca before her death based on the results of ostensibly unreliable

post mortem blood tests — was at odds with Dr. Behonick's actual testimony.

Notably, the defendant agrees on appeal that the anticipated concentration of a drug in a person's blood properly can be obtained using the mathematical calculation that Dr. Behonick employed; and the defendant further agrees that the Pennsylvania laboratory accurately measured the amount of clonidine in Rebecca's post mortem femoral blood sample. Because, as the defendant recognizes, the science underlying both figures is reliable, there was no basis to exclude either of them pursuant to a *Daubert-Lanigan* challenge.

The defendant also argues that the method used to draw the femoral blood may have compromised the sample, or that kidney damage may have affected the post mortem drug concentrations. However, neither of these claims concerned the reliability of the science used to measure the post mortem drug concentrations. Rather, these points were fodder for cross-examination and were effectively used as such by defense counsel. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 790-791 (2010).

It follows that there was no error, and therefore no substantial risk of a miscarriage of justice, resulting from the admission of Dr. Behonick's testimony without a *Daubert-Lanigan* hearing. Before leaving this issue, however, we observe that the defendant's true complaint appears to be that it was misleading for the prosecution to question Dr. Behonick about hypothetical ante mortem blood levels of clonidine that would have resulted from Rebecca's prescribed dose or a multiple thereof, in close juxtaposition to his testimony about the blood levels of clonidine detected post mortem. According to the defendant, this juxtaposition erroneously conveyed to the jury that it was valid to compare ante mortem blood levels determined prospectively with post mortem blood levels, and that, therefore, Rebecca must have been given at least double or triple the prescribed dose of clonidine before she died.

There is no merit to the defendant's position for several reasons. First, the experts for both sides made clear to the jury that the precise dosage of clonidine given to Rebecca could not reliably be determined based upon the post mortem level of clonidine because of the effects of death on the body. This point

was brought home so thoroughly that the jury could not help but understand that any comparison between amounts administered ante mortem and post mortem clonidine levels was neither precise nor valid.

Second, even if the jury drew the inaccurate inference that the post mortem levels of clonidine were exactly two or three times more than the prescribed dose, that inference was not prejudicial given that experts for both sides agreed to the more general but nonetheless devastating conclusion that the amount of clonidine prescribed for Rebecca could not account for the high concentration detected after her death.

Finally, the post mortem clonidine concentration was far from the only evidence that Rebecca had ingested an overdose of clonidine. It was essentially undisputed at trial that, at various times, Rebecca and her siblings had been prescribed clonidine, the defendant had obtained overlapping prescriptions by claiming to have lost or damaged them, only a small amount of clonidine was found in the Riley home at the time of Rebecca's death when a greater supply should have remained, the defendant made inconsistent admissions to the police and to others concerning the amount of clonidine she gave to Rebecca in the days leading to her death, and, during those final days, Rebecca was observed to be "zoning out," nonresponsive, choking, coughing uncontrollably, "floppy," and unable to walk properly — all symptoms consistent with a clonidine overdose. There also was evidence that, upon her death, a "frothy pink foam" was observed in and around Rebecca's mouth, i.e., pulmonary edema fluid, a frequent result of a drug overdose.

Because the evidence overwhelmingly supported the conclusion that Rebecca suffered a clonidine overdose regardless of the precise amount administered before her death, even if the jury obtained the erroneous impression that the amount of clonidine administered could be extrapolated with precision from Rebecca's post mortem blood concentration levels, the defendant suffered no prejudice.

2. *Third prong malice.* The jury were instructed on all three prongs of malice as an element of murder in the second degree, and returned a general verdict. The defendant now argues, as she did below, that the jury should not have been instructed on

third prong malice,[3] because the evidence did not suffice to prove beyond a reasonable doubt that her guilt could be based on that prong.[4] The standard for third prong malice is that "the defendant committed an intentional act which, in the circumstances known to the defendant, a reasonable person would have understood created a plain and strong likelihood of death." *Commonwealth* v. *Earle*, 458 Mass. 341, 346 (2010). The requirement of an intentional act "can be satisfied by a defendant's omission where the defendant has a duty to act. Thus, as a parent has a duty to provide for the care and welfare of his or her child, . . . a failure to discharge that duty can be rendered criminal if the defendant parent had the means to perform it and, depending on the circumstances, can constitute murder or involuntary manslaughter." *Id.* at 347-348.

Here, the defendant maintains that the prosecution did not adduce sufficient evidence to prove that a reasonable person would have understood that the defendant's actions created a plain and strong likelihood of Rebecca's death. More particularly, the defendant claims that she reasonably believed in the days leading to Rebecca's death that the child was suffering from a bad cold that could be treated with home remedies; that she diligently cared for the child; and that the actual cause of death was rapidly developing pneumonia, and not a drug overdose. However, in making this argument the defendant has

---

[3]The defendant assumes that third prong malice is the most likely basis for the jury's verdict, but also states that "the basis for the jury's verdict . . . might have been intentional overdose of clonidine."

[4]The Commonwealth correctly notes that malice is the element to be proved, the prongs are simply alternative methods of establishing the required element, and specific unanimity is not required as to the form of malice. See *Commonwealth* v. *Santos*, 440 Mass. 281, 289 (2003); *Commonwealth* v. *Gendraw*, 55 Mass. App. Ct. 677, 689-690 (2002). From these principles, the Commonwealth contends further that, so long as there is evidence of any form of malice, it is not error for the judge to instruct on all three variants, because the forms of malice are simply evidentiary considerations to guide the jury in determining whether the malice element has been met. In this regard, the Commonwealth analogizes to the *Cunneen* factors, see *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), which guide the jury in determining whether a murder was committed with extreme atrocity or cruelty. We need not consider the point further, however, because contrary to the defendant's position, the evidence provided ample support for a guilty verdict based upon third prong malice.

failed to comport with the *Latimore* standard. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Instead of viewing the evidence in the light most favorable to the Commonwealth, the defendant relies upon selective testimony, construed in the light most favorable to herself.

Viewed under the proper standard, the evidence permitted the jury to find as follows.[5] When Rebecca was two years old, the defendant brought her to Dr. Kayoko Kifuji, a psychiatrist who had been treating the defendant's older daughter Kate, and prescribing clonidine and Depakote for her on the basis of the defendant's descriptions of Kate's behavior. The defendant's third child, a son, also was under the care of a psychiatrist and was being treated with clonidine. Dr. Kifuji prescribed clonidine for Rebecca — and, later, Depakote, Zyprexa, and Seroquel — again based upon the defendant's reports of symptoms. The jury reasonably could infer that the defendant provided Dr. Kifuji with exaggerated descriptions of hyperactivity and impulsivity on Rebecca's part.

The jury also could infer that the defendant's objective was to secure a diagnosis and treatment that would entitle Rebecca to Social Security disability benefits.[6] Originally, Dr. Kifuji diagnosed Rebecca with attention deficit hyperactivity disorder; however Rebecca's claim for benefits submitted on that basis was denied. The defendant brought Rebecca back to Dr. Kifuji and reported additional symptoms, prompting Dr. Kifuji to make an additional diagnosis of bipolar disorder. Nevertheless, reconsideration of Rebecca's claim was denied; doctors reviewing Rebecca's application for the Social Security Administration found no basis to conclude that she suffered from these conditions. At the time of Rebecca's death, an administrative appeal was pending.

Witnesses testified that the defendant habitually gave her

---

[5]The evidence we discuss is far from a complete summary of the Commonwealth's case, which included testimony from sixty witnesses, recorded statements made by the defendant to the police, and an interview given by the defendant on the television show "60 Minutes." We confine ourselves to the evidence most germane to third prong malice, omitting, for example, additional evidence particularly suggestive of the defendant's intent to kill.

[6]The defendant, her husband, and their two older children all received such benefits.

children clonidine to keep them quiet and make them sleep. The family's social worker filed a report pursuant to G. L. c. 119, § 51A, where she expressed concerns that the children were overmedicated. Staff members at Rebecca's preschool testified that she was often lifeless, like a "floppy doll," during the school day. The school principal testified that on one occasion, Rebecca was too weak and languid to get off the school bus, and had to be carried into the building.

Despite the fact that Rebecca was prescribed doses of only one-half of a tablet, the defendant never cut the pills in half. The defendant also repeatedly asked for refills, claiming, for example, that medication had been "lost" or gotten "wet." The defendant informed Dr. Kifuji on more than one occasion that she had increased Rebecca's clonidine dosage, to which Dr. Kifuji responded that it was not acceptable to do so without discussing it with her. Dr. Kifuji expressly warned the defendant that Rebecca already was receiving the maximum dose, that clonidine was very dangerous, and that amounts in excess of the prescribed dose could be fatal. Dr. Kifuji also told the defendant not to give the children cold medicines.

In the weeks preceding Rebecca's death, the defendant increased the amount of clonidine she gave her. About one week before Rebecca died, her teachers observed that she sat lethargically in place and looked unwell. On Thursday, December 7, 2006, Dr. Kifuji saw Rebecca for the last time and told the defendant that they should plan to taper off Rebecca's clonidine going forward.

By Saturday, December 9, 2006, four days before her death, Rebecca appeared extremely ill to those who saw her. At that time, the defendant and her family were living temporarily with James McGonnell (the defendant's half-brother); his fiancée, Kelly Williams; and Williams's son. McGonnell observed Rebecca to be sluggish, feverish, and coughing in a way that "when you heard it, it hurt." When Williams told the defendant that Rebecca was complaining of a stomachache, the defendant responded that Rebecca was just pretending to be sick in order to get attention. Both McGonnell and Williams urged that Rebecca be taken to the doctor. By this point, Rebecca had a "barky, croupy cough," for which the defendant was administering cough medicine, contrary to Dr. Kifuji's warning.

By Sunday, December 10, Rebecca's condition had worsened to the point that she was feverish, sweating, and coughing more frequently. The defendant was observed giving Rebecca an inch of cough medicine in a coffee cup. When Williams told the defendant that her (Williams's) pediatrician had said not to mix clonidine and cold medication, the defendant insisted that Dr. Kifuji said otherwise. Williams tried to convince the defendant that Rebecca should go to the doctor, to which the defendant responded that the pediatrician's office was closed on Sunday. Williams then suggested taking Rebecca to the emergency room because she, Williams, "didn't want [the defendant] to wait until the next day." McGonnell, too, told the defendant to bring Rebecca to the doctor or a hospital. Later, the defendant told McGonnell — untruthfully — that she had made an appointment for Monday.

On Monday morning, the defendant and her husband informed McGonnell and Williams that they needed to go to the Social Security office to "straighten out" an issue with the husband's benefit checks. They took Rebecca with them, but Rebecca vomited at the office, and they were asked to leave. When they returned home and Williams learned that the defendant had not taken Rebecca to the doctor, Williams told the defendant that she needed to take Rebecca to the emergency room. McGonnell, too, spoke to the defendant about taking Rebecca to the emergency room.

As the day wore on, Williams saw Rebecca's condition continue to deteriorate. A house guest who was staying in the basement described Rebecca as having a blank look on her face and becoming "nonresponsive." Williams twice offered to take Rebecca to the emergency room, but the defendant responded that she would take care of it. That evening, McGonnell observed the defendant again giving Rebecca cough medicine.

On Tuesday morning, the defendant and her husband returned to the Social Security office with Rebecca. When they arrived back home, Williams overheard the defendant and her husband arguing about money and how they would struggle to support the children if he lost his Social Security money. Williams emphatically told the defendant that she needed to take Rebecca to the hospital, to which the defendant falsely responded that

they had a medical appointment on Wednesday morning. By late afternoon, Rebecca was constantly coughing and choking, and had vomited multiple times. McGonnell became enraged and threw a bookcase, telling the defendant's husband that they needed to take Rebecca to the doctor. McGonnell threatened to hurt the defendant's husband so that when the ambulance came they would have to take Rebecca to the hospital. After Mc-Gonnell's outburst, Williams again offered to bring Rebecca to the hospital, but the defendant refused.[7]

Later, when Rebecca knocked on her parents' bedroom door, her father repeatedly sent her away and shoved her down the hallway. As Rebecca walked back down the hallway crying, McGonnell kicked open the bedroom door and yelled at the defendant and her husband to take care of Rebecca and to bring her to a doctor. The defendant and her husband left the apartment for about two hours in the early evening to do an errand. The other occupants of the house testified that Rebecca's condition continued to deteriorate, as she became "totally oblivious," "completely incoherent," and "zombie-like." When the defendant and her husband returned, Williams reported to them that Rebecca was acting "really strange" and that if the defendant did not do something, Williams was going to telephone 911. According to Williams's testimony, by that point she had spoken to the defendant about getting medical attention for Rebecca seven times since Saturday, and had heard McGonnell do so two or three times.

Around midnight, McGonnell heard choking coming from Rebecca's room. She was gagging on vomit and gasping for air. He again kicked in her parents' bedroom door and screamed at the defendant and her husband to take Rebecca to the doctor, saying, "What if she dies?" At 1:00 A.M., the house guest staying in the basement heard Rebecca calling for her mother in a "faint, raspy voice." He woke up McGonnell, who screamed at the defendant and her husband and again told them to get Rebecca medical attention. Later, during the night, the defendant and her husband gave Rebecca cold medicine. In the morn-

---

[7]Both McGonnell and Williams testified that they did not seek aid for Rebecca on their own because they believed that only a child's parents could obtain medical treatment for her.

ing, Rebecca was found dead on the floor — lying on magazines, without a blanket, and wearing only a pull-up diaper — next to her parents' bed.

The medical examiner testified that the cause of death was intoxication due to the combined effects of clonidine, Depakote, dextromethorphan (cough syrup), and chlorpheniramine (cold medicine). The amount of clonidine alone was at a level that would have caused death as a result of heart failure and pulmonary edema.

Given this state of the evidence there is no merit to the defendant's claim that this case is analogous to *Commonwealth* v. *Earle*, 458 Mass. at 342, where the Supreme Judicial Court reversed the defendant mother's conviction of murder in the second degree on account of the death of her child. In the *Earle* case, *id.* at 341-342, 350, the defendant had left her twenty-one month old daughter in the care of her boyfriend and returned to find the child sick and vomiting; however, there was no evidence that the defendant saw the infliction of any trauma. The child was up all night vomiting and experiencing stomach pain. *Id.* at 342. In the morning her color was observed to be "way off," and she was vomiting a green substance, was listless, and seemed to be in pain around her abdomen. *Id.* at 342-343. The defendant's telephone records confirmed that a single, four-minute telephone call was placed to the child's doctor's office at noon. *Id.* at 343. The defendant told others that when she telephoned the doctor's office she had been told that it sounded as if the child had "the flu." *Ibid.* The defendant then went to the drug store and left the child with a neighbor. *Ibid.* While the defendant was gone, the child stopped breathing, the police were contacted, and the child could not be resuscitated. *Id.* at 344. Years later, the defendant's boyfriend disclosed that while watching the child he had thrown her to the ground and stomped on her stomach. *Id.* at 345. He and the defendant then were separately prosecuted. *Id.* at 342, 346.

The Supreme Judicial Court held that the defendant's failure to seek medical care did not satisfy the malice element of murder in the second degree. *Id.* at 350-352. Significant to the court's decision was that no evidence was presented that suggested that the symptoms observed by the defendant were of a type that

would have alerted a person without medical training that death was likely, and witnesses who saw the child during the day did not react to the child's appearance as that of one who was gravely ill. *Ibid.*

Here, on the other hand, the defendant was the source of Rebecca's injuries. The evidence established that she intentionally and repeatedly administered clonidine to Rebecca in excess of what was prescribed despite having been told that doing so could be fatal and, in the face of Rebecca's severe deterioration in the days prior to her death, also gave her large amounts of cough medicine, contrary to a doctor's orders. Finally, the defendant responded with indifference and lies to the increasingly desperate pleas of others that Rebecca needed urgent medical attention — including McGonnell's angry outburst, "What if she dies?" These circumstances amply sufficed to support a finding of third prong malice. See *Commonwealth* v. *Fickling,* 434 Mass. 9, 14 (2001) (jury could find third prong malice based upon defendant having left his toddler alone with her dead or dying mother in apartment in July, without care or alerting anyone of child's plight); *Commonwealth* v. *Robidoux,* 450 Mass. 144, 145-146 (2007) (jury instructed on third prong malice where defendant deprived child of solid food while observing his resulting starvation).

3. *Character evidence.* The defendant claims that certain evidence depicting her behavior was irrelevant and prejudicial. Almost all of the evidence that the defendant now contests was admitted without objection at trial; but whether we review for prejudicial error or a substantial risk of a miscarriage of justice, we find no merit to the argument.

Evidence of a defendant's misconduct may not be admitted for the purpose of establishing her bad character, but may be admissible for other purposes. See, e.g., *Commonwealth* v. *Mullane,* 445 Mass. 702, 708-709 (2006); Mass. G. Evid. § 404 (2013). Here, evidence suggesting that the defendant had devised a scheme to secure psychiatric medications for her children in order to obtain Social Security disability benefits was probative of the defendant's motive and intent for giving them unnecessary medication and for doing so regardless of the contraindications. Furthermore, because the Social Security

Administration twice had denied Rebecca's application for benefits, such evidence also was probative of the defendant's motive and intent in causing or deliberately allowing Rebecca to die. See *Commonwealth* v. *Dung Van Tran*, 463 Mass. 8, 14-15 (2012). Likewise, evidence of the defendant's actions and demeanor in the immediate aftermath of Rebecca's death were probative of her state of mind at the time of the murder. See *Commonwealth* v. *Rice*, 427 Mass. 203, 210 (1998); *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 434-435 (2001). Finally, even if we were to conclude that certain evidence regarding the defendant's unclean and unkempt living conditions and appearance should not have been admitted, we discern no prejudice in view of the overwhelming, properly admitted evidence of her neglectful and abusive parenting, and the jury's acquittal on the greater charge of murder in the first degree.

*Judgment affirmed.*