NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1117

COMMONWEALTH

vs.

JAVIER SMITH.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Javier Smith, was convicted of murder in the second degree on a theory of joint venture.[1]  He appeals, arguing that there was insufficient evidence to support the conviction. Because we conclude that the evidence was sufficient for a rational jury to find that the defendant knowingly participated in the murder and shared the principal shooter's malicious intent, we affirm.

Background.  Where the defendant challenges the sufficiency of the evidence, we summarize the facts the jury could have found, viewing the evidence in the light most favorable to the

---

[1] Jerome Meade and Lee Gill (codefendants) were also indicted for murder in the first degree in the victim's shooting.

Commonwealth.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  We reserve certain details for discussion.[2]

On September 16, 2015, just before noon, the victim, Luis Bodden Maximo, drove with his girlfriend to a restaurant to get lunch.  They parked in a lot behind the plaza where the restaurant was located and walked down a set of stairs to the plaza.  Outside the restaurant, the victim encountered a friend of his.  The girlfriend went into the restaurant, ordered a drink, and sat down at a table near the entrance.  The victim briefly greeted his friend and then entered the restaurant at 12:01 P.M., where he sat down across from his girlfriend, facing the entrance.  He used the restroom and then returned to his seat within minutes.

At around 12:06 P.M., the defendant arrived in a red Jeep with Jerome Meade and another person,[3] around the corner from the

_____

[2] This was the defendant's second trial.  On December 10, 2015, a grand jury indicted the defendant and the codefendants for murder in the first degree, pursuant to G. L. c. 265, § 1. The defendant and Gill were tried together.  Following a jury deadlock in October 2018, the judge declared a mistrial.  Prior to retrial, the defendant filed a motion to dismiss the indictment pursuant to Mass. R. Crim. P. 13, as appearing in 442 Mass. 1516 (2004).  The first trial judge partially allowed the motion by dismissing the indictment insofar as it alleged murder in the first degree, but allowed the Commonwealth to proceed at retrial under so much of the indictment that charged murder in the second degree.

[3] The Commonwealth alleged that the other person was Gill, who was subsequently acquitted of all charges after a jury trial.

plaza.[4]  The plaza was located on one side of a five-way intersection in Boston (intersection), bordering Calumet Street to the southwest and Tremont Street to the southeast.  The Jeep approached the plaza on Calumet and came to a stop on the side of the road for about fifty seconds, after which the defendant exited the vehicle and the Jeep drove away.  The defendant wore a striped blue and white sweatshirt with the hood up at a time when many pedestrians were in short sleeves, though some wore long sleeves or a light sweater.  The defendant walked around the corner, through the plaza, and entered the restaurant at 12:07 P.M.

After the defendant entered the restaurant, the victim's "mood changed" from "happy" to "alert."  The victim told his girlfriend, "[h]e's from the block.  We have to go, babe."  The defendant then turned around and left the restaurant.  Excluding time spent in the vestibule, the defendant was inside the restaurant for less than thirteen seconds.

The victim and his girlfriend left the restaurant about twenty seconds after the defendant, without having ordered any food.  The victim remained concerned.  He and his girlfriend

_____

[4] Police found Gill the next day in the driver's seat of the Jeep, which was registered to Gill's mother.  Text messages between Gill and Meade the morning of September 16 showed that Gill picked Meade up at 11:59 A.M., just minutes before the shooting.

exited the plaza and headed back toward their car, alternately walking briskly or running back up the stairs to the parking lot.

As the victim was walking through the plaza, the red Jeep drove past the plaza. Meade got out of the Jeep a few seconds later and began to trace the same path to the parking lot as the victim. He ran up the stairs and arrived at the top twenty-three seconds behind the victim. The defendant and the girlfriend reached their car at 12:09 P.M. Less than ten seconds later, Meade caught up to the victim. As Meade approached, he insulted the victim and yelled "you're the ops"[5] before discharging seventeen rounds from a firearm at the victim, striking him eleven times and ultimately killing him.

After the defendant left the restaurant, he ran and walked a circuitous path. He walked out of the plaza and began to sprint on the sidewalk along Huntington Avenue to the west. He ran across Calumet, where he had initially been dropped off, and then abruptly ran through traffic into the middle of Huntington Avenue, where he reversed course, sprinted through the busy intersection and continued on Huntington in the opposite direction past the plaza to the northeast. Not long after, the defendant again reversed course, returned to the intersection,

_____

[5] The girlfriend testified that she understood "ops" to mean "opposition."

4

and proceeded to walk along Tremont Street. At some point, he removed his hood. At another point, he removed the sweatshirt and tied it around his waist. He walked a few blocks down Tremont, then turned around and walked back up toward the intersection, then walked back down Tremont again.

A police officer driving to the crime scene stopped to question the defendant because he noticed that the defendant's clothing matched the suspect's description and that the defendant was turning to look at each police cruiser that passed by him. The defendant told the officer that he was coming from a nearby pizza shop and had left without eating because the line was too long. At a subsequent police interview on October 15, 2015, the defendant recounted differently that he had eaten a slice of pizza at the shop.

Following a twelve-day trial in May 2022, the jury found the defendant guilty of murder in the second degree.[6] On June 3, 2022, the judge sentenced the defendant to a term of life in prison, with the possibility of parole after fifteen years.

Discussion. The sole issue raised by the defendant on appeal is whether there was sufficient evidence for the jury to convict the defendant of murder in the second degree on a theory

---

[6] The defendant and Meade were tried together, and the jury convicted Meade of murder in the first degree and various firearm charges.

of joint venture.  After a close review of the record, we determine that the evidence was sufficient.

On reviewing a claim of insufficiency of the evidence, "[the] question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Latimore, 378 Mass. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

To prove the defendant's participation as a joint venturer in a murder in the second degree, the Commonwealth was required to prove beyond a reasonable doubt that (1) the defendant knowingly participated in the commission of an unlawful killing, and (2) the defendant had or shared the required criminal intent of malice.  Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009).  See Commonwealth v. Earle, 458 Mass. 341, 346 (2010) (murder in second degree is an unlawful killing with malice).  As relevant here, to show "third prong malice," the Commonwealth's burden was to prove that "the defendant committed an intentional act which, in the circumstances known to the defendant, a reasonable person would have understood created a plain and strong likelihood of death."  Id.

1.  Participation.  The defendant argues that the Commonwealth's evidence was insufficient to show that the

6

defendant meaningfully participated in the murder.  We are not persuaded.

At trial, the prosecution presented to the jury the theory that, because Meade wanted to kill the victim "out [in] the open where it's easy to get away," the defendant's role in the operation was to intimidate the victim to induce him to leave the restaurant.  The jury heard and saw evidence of the defendant's brief thirteen-second stay in the restaurant; the victim's sudden change of demeanor upon seeing the defendant; his apprehensive comment to his girlfriend -- "[h]e's from the block, we have to go" -- and near-immediate departure; and Meade's converging on the victim just seconds after the victim exited the restaurant.  From this the jury could deduce that the defendant's appearance in the restaurant was calculated to instill fear in the victim such that he would imminently depart, and therefore the defendant played a "central role" in the commission of the murder by flushing the victim out of the restaurant to a location where Meade could effectively pursue him.  Commonwealth v. Tyler, 493 Mass. 752, 765 (2024).  See id. (defendant's participation in robbery included luring victim into unlocking door, thereby rendering victim vulnerable to principal who was waiting outside).

2.  Malice.  We are also unpersuaded by the defendant's contention that there was insufficient evidence for the jury to

7

find that the defendant acted with malice.  He contends that he could have happened to have left his friends to enter the restaurant alone, seen the victim, and fled in fear.

Prior to entering the restaurant, the defendant was in the red Jeep with the codefendants and stopped for around fifty seconds before getting out.  "It is reasonable to infer that, during that period of time, the defendant and [Meade] discussed their plan further and that [Meade] made the defendant aware of the gun."  Commonwealth v. Robinson, 493 Mass. 303, 308 (2024).  Reinforced by the tight timing of the operation, the jury could infer that the defendant was privy to Meade's plan to follow and ultimately shoot the victim after the defendant played his part in inducing the victim to leave the restaurant.  The jury could consider that, just as the defendant exited the Jeep, he appeared to be donning a "hoodie" sweatshirt with the hood over his head despite the outdoor temperature being sixty-eight to seventy degrees, inferably to obscure his identity.

Evidence of the defendant's behavior after he left the restaurant also could have rationally led the jury to infer that the defendant anticipated the shooting.  His sprinting away from the restaurant and the erratic path that he took up and down the streets near the plaza, passing by the plaza multiple times, suggest that the defendant was attempting to distance himself from the impending shooting or urgently seeking to rejoin the

8

Jeep to escape. The jury saw evidence that at the time of the shooting the defendant was looking over his shoulder in the direction of the parking lot while no pedestrians in his vicinity demonstrated awareness of the shooting as it transpired.[7] It was permissible for the jury to infer the defendant's shared intent both from his participation in the crime and from his knowledge of the circumstances. Commonwealth v. Brown, 477 Mass. 805, 817 (2017), cert. denied, 586 U.S. 826 (2018).

Furthermore, the jury heard evidence that the defendant did not mention during police questioning that he had entered the restaurant and seen the defendant. Instead, the defendant told the police that he was coming from a pizza shop before he was stopped for questioning, an "alibi [that] was belied by" extensive video footage accounting for the defendant's whereabouts in the period surrounding the shooting.[8] Commonwealth v. Strong, 495 Mass. 119, 128 (2024). The defendant later changed his story about whether he had eaten pizza while in the shop. Such "evidence suggesting

---

[7] At the sound of gunshots, pedestrians on a nearby street closer to the shooting scattered.

[8] By comparing the video footage and map of the area with testimony from the officer about how long it takes to traverse Tremont Street, the jury could reasonably infer that the defendant did not stop for pizza.

consciousness of guilt . . . is probative of the defendant's guilty state of mind" (quotation and citation omitted). Id.

The defendant argues that a favorable outcome is compelled by a string of recent Supreme Judicial Court decisions reversing joint venture murder convictions for insufficient evidence of lethal intent. See Commonwealth v. Tse, 495 Mass. 74, 81-84 (2024); Commonwealth v. Baez, 494 Mass. 396, 401-405 (2024); Baxter v. Commonwealth, 489 Mass. 504, 509-511 (2022). In the time since the parties submitted their briefs, the court has clarified the holdings of those cases. See Commonwealth v. Carleton, 497 Mass. 11, 16 (2026). The cases relied on by the defendant are distinguishable from the case before us in that they each featured a "defendant [who] drove a vehicle in a helpful manner for another person who killed someone outside the driver's presence or acted merely as a getaway driver for such a person." Id. In each case, there was a paucity of evidence to establish either that the defendant participated in the crime before the getaway phase, or that he had prior knowledge of the shooter's lethal intent. See id. (summarizing cases). By contrast, the evidence here "permitted the jury reasonably to infer that the defendant's [conduct] was designed to facilitate the shooting, and that the defendant continued to act in furtherance of a joint venture" with knowledge of the shooter's lethal intent. Id.

10

For the foregoing reasons, we conclude that there was sufficient evidence for the jury to find that the defendant acted with malice, because he reasonably should have understood that his actions "created a plain and strong likelihood of [the victim's] death."  Earle, 458 Mass. at 346.[9]

                                    Judgment affirmed.

                                    By the Court (Henry, Sacks &
                                      Tan, JJ.[10]),

                                    *Paul Little*

                                    Clerk

Entered:  February 18, 2026.

---

[9] The defendant argues that consciousness of guilt evidence was not sufficiently compelling to overcome the weakness of the Commonwealth's case.  We conclude this argument fails for the reasons stated above.

[10] The panelists are listed in order of seniority.

11